**UNITED STATES of America**

v.

**Ray WILLIAMS, Appellant.**

**No. 75–1592.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 11, 1975.

Decided Feb. 23, 1977.

Rehearing En Banc Denied April 27, 1977.

Stuart Stiller, Washington, D. C. (appointed by this Court), for appellant.

Mark A. Tuohey, III, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, and Stuart M. Gerson, Asst. U. S. Attys., Washington, D. C., at the time the brief was filed, were on the brief for appellee.

Before TOM CLARK,* Associate Justice of the Supreme Court of the United States, BAZELON, Chief Judge, and ROBINSON, Circuit Judge.

Opinion for the Court filed by Chief Judge BAZELON.

Dissenting opinion filed by Justice CLARK.

BAZELON, Chief Judge:

Appellant was tried by a jury and convicted of armed bank robbery.[1] He was sentenced to five to twenty-five years imprisonment. Since we are unable to conclude that evidence erroneously admitted against him was harmless, we reverse.

## I.

At about noon on November 19, 1974, two men entered the Public National Bank in northwest Washington. They approached a teller's cage in which two tellers, Thomas Higdon and Dennis Wisner, were counting money. Suddenly, Higdon saw an orange and yellow plastic bag flying into the cage. Brandishing a gun, one of the men ordered the tellers to "fill up the bag quick" and directed the other people in the bank to lie down on the floor. Rivolanne Sachs, an assistant bank manager, had been talking to a customer, Sheldon Meyers. She walked to her desk and pressed a button activating surveillance cameras before complying with their direction. Higdon and Wisner placed almost $5800 in the plastic bag. Some of that money was wrapped in pink bands marked with the words "Public Nat. Bank," the date, and the number 30. The robbers took the bag and backed towards the door. They had been in the bank about five minutes.

On November 21, FBI agents investigating the robbery showed an array of photographs to Ms. Sachs. She selected a photograph of the appellant as "the one that looked like the robber."

On November 22, while investigating an unrelated crime, two government agents

---

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

1. 18 U.S.C. § 2113(a)(d).

were admitted to an apartment in Silver Spring, Maryland. That apartment was shared by Roland Wolford and one of appellant's eleven siblings, Gloria Williams. The agents arrested Wolford on an unrelated charge. In a subsequent search of the apartment, the officers discovered, in a dresser drawer, a gun and two packets bound with pink wrappers, on which were inscribed the words "Public Nat. Bank," November 19, and the number 30. The packets contained $995 in five dollar bills. Wolford was charged with, and pleaded guilty to, the robbery of the Public National Bank.

Police arrested Williams on December 3, 1974. When arrested, Williams identified himself to police as "Richard Johnson." His head was shaved, and his face was clean shaven. Each of the bank robbers had had bushy hair and a moustache.

Wisner, Higdon, Sachs, and Meyers attended line-ups in which Williams was present. Wisner made no identification; Meyers identified another man rather than Williams as one of the robbers; Higdon and Sachs identified Williams. Higdon and Sachs also identified Williams in court. Although in court Higdon identified Williams' waist-length vinyl jacket as that worn by the robber, he had earlier described the robber's jacket to FBI agents as a "London Fog-type," "corduroyish" coat. Meyers, who did not identify Williams, identified Williams' jacket as the robber's. The government also introduced approximately 200 frames of bank surveillance photographs. Over strenuous defense objections, the $995 found in the apartment shared by Wolford and Gloria Williams was admitted into evidence. The government later presented testimony that the money had been found in Williams' sister's apartment. The jury was never told that the other inhabitant of that apartment had pleaded guilty to the robbery for which Williams was charged.

The defense presented three alibi witnesses who testified that at the time of the robbery, they had been with Williams at the home of his niece, Sharon McLean. They testified that they remembered that particular day because it was the birthday of Ms. McLean's son, Nathaniel, and a small party had occurred. Their recollection was corroborated by the introduction into evidence of Nathaniel's birth certificate. Williams did not take the stand.

Before the jury retired to consider its verdict, the judge informed the jurors that if they did not return with a verdict by 5:30 p. m. that evening, the court would recess for the weekend and reconvene the following Monday. After the jury had deliberated for nearly two hours, it requested to view the defendant. Over the objections of defense counsel, Williams was ordered to approach the jury box and face the jurors. After viewing Williams, the jurors retired and returned twenty-one minutes later, at 5:16 p. m. on a Friday evening, with a verdict of guilty of armed bank robbery.[2]

On this appeal, Williams contends first, that the court erred in admitting the $995 as evidence and in allowing testimony that the money was found in his sister's apartment; and second, that it erred in ordering him to approach and face the jury when he had not taken the stand at trial.

## II.

■ Admission of the contested pieces of evidence required a determination that they were relevant to a material proposition and a further determination that their probative value outweighed their potential prejudice.[3] A trial judge's determination will be reversed only for an abuse of discretion. *Hardy v. United States,* 118 U.S.App.D.C. 253, 335 F.2d 288, 289 (1964).

Evidence that the money had been discovered outside the bank was relevant in proving that a robbery had indeed taken place. However, since this fact was uncontroverted, the money would have been immaterial if admitted on this issue alone.

2. *Id.*

3. *See* Fed.R.Evid. 403; McCormick on Evidence 433 (2d ed. 1972).

Evidence concerning the *location* of the recovered money presents a much more troubling question both as to relevance and as to probative value versus potential prejudice. When the government initially attempted to introduce into evidence the money found in the apartment shared by Wolford and Gloria Williams, defense counsel objected that the connection between Williams and items found in that apartment was too flimsy to have any relevance on the issue of appellant's guilt. The government, however, contended that the nexus between Williams and the apartment was far from tenuous. It asserted an ability to demonstrate that appellant had the same rights of access as the inhabitants of the apartment.[4] The court, however, admitted the money into evidence and received testimony that that money had been discovered in the apartment before a foundation based on Williams' access, frequent or otherwise, was laid. Nor was his access subsequently established. No evidence was introduced that Williams had ever even visited the apartment, let alone lived in it. Nor was evidence introduced to show that Williams and Wolford were co-conspirators, joint-venturers, or had any other relationship. Gloria Williams' uncontroverted testimony was that she saw "very little" of her brother around the time of the robbery. This sibling relationship was the only nexus connecting Williams with the money found in the apartment; the government failed to distinguish Williams' association with the stolen property from the similar connections that many others—including Williams' ten other brothers and sisters, and all of Wolford's friends and relatives—bore to it. Standing alone, Williams' blood relationship with one co-occupant of an apartment was an exceedingly thin strand to support the threshold requirement of relevance.

■ Even assuming that the evidence was somehow relevant, its slight probative value was far outweighed by its great potential prejudice. This prejudice arose because the jury was not told that the other occupant of the apartment had admitted participating in the robbery and may well have been solely responsible for placing the money in the apartment without Williams' participation or knowledge. Even if relevance had been more clearly established by showing that Williams had ready access to the apartment, information about Wolford's guilty plea would have allowed the jury to attribute the money to another, perhaps more probable source than Williams. Without this information, there is great danger that the jury drew the inference that *only* Williams would have placed the money there, and then used this faulty conclusion to resolve doubts about the uncertain identification evidence (*see* Part III *infra*) against Williams. Under these circumstances, it was error to admit the evidence concerning where the stolen money had been found.

■ Defense counsel clearly articulated the objectionable characteristics of this evidence in two lengthy bench colloquies before the evidence was introduced. He did not, however, object to it at the time it was presented. F.R.Crim.P. 51 requires that "a party, at the time the ruling or order of the

---

4. [U.S. Attorney]: Now I think the significant nexus in this case is that each man, Roland Wolford and Ray Williams, had equal access to the interior of the sister's house, Gloria Williams.

The Court: Not on the present record.

[U.S. Attorney]: Well, it will come out in due course.

.     .     .     .     .

The Court: . . . I think your order of proof is to indicate—this is probably through Gloria Williams, that her brother was frequently there; Wolford lived there; and that this something that was taken . . . was taken from the apartment.

. . . But on the present record it got picked up 30 miles away at somebody else's house . . . .

[Defense Counsel]: . . . The kind of foundation that the Court is asking [The U.S. Attorney] to lay is easily laid . . . just that it was taken from Gloria Williams' apartment, and she is his sister, and Wolford lived with her.

The Court: There is one further step. That Williams frequented the apartment.

(Tr. 114, 119.)

court is made or sought, [must make] known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor." We ought not apply this rule in a ritualistic fashion. Where, as here, the problem has been brought to the attention of the court, and the court has indicated in no uncertain terms what its views are, to require a further objection would exalt form over substance. C. Wright, Federal Practice and Procedure: Criminal § 842 (1969).

### III.

■ The remaining question is whether the error was harmless. F.R.Crim.P. 52(a). The applicable test for determining whether an evidentiary error is harmless or prejudicial is "whether we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Gaither v. U. S.,* 134 U.S.App.D.C. 154, 413 F.2d 1061, 1079 (1969).

Looking first at only the testimonial evidence, this case is far from clearcut. Only two of the four eye-witnesses who attended line-ups in which Williams was present identified him as the robber. The government's most confident identity witness described the robber's coat to FBI agents as a corduroy, "London Fog-type jacket"; the coat introduced into evidence as Williams' was a short, vinyl jacket. The other witness who identified Williams' jacket as the robber's picked another man in line-up. The defense presented three alibi witnesses, who testified that at the time of the robbery they had been with Williams at the home of his niece.

■ In addition to the testimonial evidence against Williams, the government introduced 176 frames of bank surveillance photographs taken during the robbery, 71 of which included Williams. Their impact must also be considered. At first blush, 71 photographs of a robbery in progress may seem to be the best possible evidence for identifying an unmasked robber. But the value of photographs as identity evidence depends on their clarity and resemblance to the person they purport to identify. Thus, it would be inappropriate to attribute strength to the government's case from the mere presence of the photographs at trial.[5]

The prosecutor's closing argument casts considerable doubt on any claim that the photographs here were decisive.[6] His only comments on the accuracy of the photographs were, in effect, apologies for a lack of clarity. He followed every mention of the photographs with a suggestion that the jury consider the testimonial evidence, rather than the photographs as the primary evidence.[7] He presented the discovery of

---

5. *See United States v. Gregg,* 414 F.2d 943, 947 (7th Cir. 1969), in which defendant appealed from a conviction for bank robbery. For the purpose of evaluating harm resulting from possible error, the court assessed the strength of the government's case "apart from the photographs taken of the robbery in progress."

6. The closing arguments, which were not part of the record originally before us, were most helpful in evaluating the strength and importance of the various pieces of evidence here. Transcripts of closing statements are not supplied when requests are made for "trial transcripts" on CJA 21, the form used to request materials for appeal. Counsel should be aware that unless CJA 21 is amended to include transcripts of closing statements in "trial transcripts," closing statement transcripts will not be supplied unless specifically requested.

7. [This] is an unusual case in that you almost have a movie of this whole robbery because there are over two hundred frames, that means individual pictures on these two reels of film. . . .

Pay very careful attention to them, ladies and gentlemen. But they are not the most crucial element in this case, because a photograph is a moment stopped in a moment of time, and it is frozen for infinity, and it is frozen for the length that that photograph exists, and all it is is just a stop in a moment of time and it is a view from a particular angle, and it is a view from a particular position. . . . There are basically two requirements that you have to bring to this

the money in Gloria Williams' apartment as the final element in the prosecution's case and "proof of Williams' guilt."[8] And he returned to it near the end of his rebuttal argument describing this evidence as the "connection" that made his other evidence "fall into place."[9]

We have examined the photographs and compared them with a line-up photo and one other photo of the appellant, both of which were part of the record. The photographs are reasonably clear,[10] and the resemblance between appellant and the person alleged to be him in the bank photos is not far-fetched. But the jury was evidently troubled by the issue of identity, and the error here went to that issue. The scenario of one or more jurors, unwilling to find the accused guilty on the basis of inconclusive identifications and photographs, being finally convinced of his guilt because the stolen money was found in his sister's home

with no apparent explanation is an all-too-plausible one.[11] Thus, we are unable to say, without the gravest doubts, that the testimony described by the Government as the "connection" making its other evidence "fall into place" had no substantial influence on the result here.

It is precisely in close cases such as this, that the danger of prejudice is greatest. *Cross v. United States,* 122 U.S.App.D.C. 283, 353 F.2d 454, 456 (1965); *Jones v. United States,* 119 U.S.App.D.C. 213, 338 F.2d 553, 554 (1964). That the case was close does *not* mean, as the dissent suggests, that there would be insufficient evidence to support a verdict of guilty absent the objectionable evidence; otherwise, there could never be retrials after findings of prejudicial error. Moreover, we do not hold that evidence of the money's location is absolutely inadmissible. We hold simply that as presented in this case, the evidence was

case. A viewing of the photographs, but that is not primary. . . .
Tr. Closing Argument, pp. 3–4.
Now, a camera will take a picture under lighting conditions and it will adjust to those lighting conditions, and it may not be the best photograph. It may not be the type of photograph that you might have of your child taken on a school day or when they are at school and they come home.
But a photograph renders a picture of the person. If it could be better, ladies and gentlemen, certainly it would be as best as possible. But it is rendered under conditions that are less than perfect.
Tr. Closing Argument, p. 5. *Also see* Tr. Closing Argument, p. 9.

8. The government offers a third part and that is the money. . . .
Ladies and gentlemen, there really is not any dispute, it seems to me, that this money is the money that was taken from the bank.
And where was it found, ladies and gentlemen? It was found in Gloria Williams' house. Gloria Williams, the sister of Ray Williams.
Ladies and gentlemen, I am going to offer this as proof of the guilt of Mr. Williams.
Tr. Closing Argument, p. 9.

9. Consider the fact that on November 22 Gloria Williams was in that house and knew that an arrest was made and knew that money was taken out. . . . What is the relationship? It is a brother and sister relationship.

Now [defense counsel] would pooh-pooh this fact. But the money is money that can be traced back to time, place, circumstances. Noon time, November 19th, Public National Bank, 7800 Eastern Avenue. The connection is that it was in his sister's house. It is not coincidence; it falls into place.
Tr. Rebuttal Argument, p. 27.

10. The U.S. Attorney's office that had custody of the bank photographs submitted to the jury, failed to preserve those photos for appeal. However, the negatives from which they had been developed were still extant, and other reproductions were printed from them. Counsel for both parties stipulated that these new prints accurately represented the photographs submitted to the jury. If counsel had not so stipulated, it would have been more difficult to evaluate, on appeal, the strength of those photos as evidence. While we managed here to avoid the potentially harmful consequences of the government's failure to preserve evidence for appeal, we take this occasion to impress upon those charged with preserving evidence, the necessity for faithful performance of that duty.

11. That the jury returned to view the defendant and then reached a guilty verdict does not necessarily mean, as the dissent suggests, that *all 12* jurors made up their minds on the basis of a comparison between the defendant and the photos.

inadmissible because there was not a sufficient showing of relevance (*i. e.,* appellant's connection with his sister's apartment) and because the jury was not also told that one occupant of the apartment had pleaded guilty to the bank robbery.

*Reversed and remanded.*

Justice CLARK, dissenting:

The court reverses this bank robbery conviction despite the fact that 71 frames of bank surveillance film depict full length, facial, and profile views of Williams robbing the Public National Bank in Washington, D.C.[1] In addition to the strong case made by these photos, the jury was also presented with other substantial evidence of Williams's participation: (1) two eyewitnesses identified Williams as one of the robbers; (2) the coat he was wearing at the time of his arrest was identified as being the one worn by a participant in the robbery;[2] and (3) $995 of the proceeds of the robbery were found in Williams's sister's apartment.[3] The court's sole ground for reversal is the admission of the $995 and testimony about where it had been found. The court concludes that the admission of this evidence is error so prejudicial as to require reversal.[4] I cannot agree and respectfully dissent.

The proceeds of the robbery were clearly admissible evidence as fruits of the crime. The testimony had been that money was taken from the Public National Bank and that a particular teller's identification mark had been placed on the money. The money proffered had the same bank's wrappers around it and contained the identification marks of the teller who testified to being robbed. The fact of where the money was found was likewise probative.[5] Its admission left a rebuttable inference that Williams did try to rebut. Upon defense counsel's questions, his sister testified that Williams seldom frequented the apartment and that Wolford was her common-law husband and shared the apartment and its furnishings with her, including the dresser in the master bedroom in which the money was found. The jury heard this testimony and resolved this question against Williams. We should not second guess the jury's reso-

1. Altogether, 176 frames depict Williams and his accomplice during the robbery. Williams appears in 71(40%) of those frames submitted to the jury. The quality of the film cannot be exaggerated; the face, hat, coat, and gun of Williams are clearly depicted.

2. This coat was specifically identified before the jury, first by the officer who arrested Williams and then by an eyewitness to the robbery. In addition, the bank film clearly depicts the coat in all its features. The arresting officer also testified that, when arrested, Williams identified himself as Richard Johnson. The arrest was made on December 3, 1974, upon a warrant issued on November 22, 1974, only three days after the robbery.

3. Roland Wolford, the appellant's accomplice, also lived in that apartment. Wolford pled guilty to the robbery, but apparently the Government allowed, as part of the agreement accepting the plea, that Wolford would not be required to testify at Williams's trial. The jury was carefully instructed to disregard all mention of Wolford in considering the case against Williams.

4. The court says that "counsel clearly articulated the objectionable characteristics of this evidence in two lengthy bench colloquies," but admits that no objection was made at the time the money was offered. Opinion at 6. What the court fails to note is that the objection made earlier was made to both the money and a gun that was recovered at the sister's apartment. Although two guns were used in the robbery, the record made on the motion to suppress reveals that the gun recovered was a small caliber handgun as had been used by the participant alleged to be Williams, while Wolford's gun was a much larger caliber gun. The court refused to admit the small gun, no doubt because the gun, unlike the money, could not be directly linked to the gun used by Williams in the robbery, indeed, this difference between the gun and the money explains why an objection to the money should have been more clearly articulated when the money was finally offered into evidence.

5. Unlike the gun, the money here was directly linked to the robbery. The question of the weight to be given the evidence of where the money was found was left clearly for the jury to resolve, especially when the defense counsel failed to articulate an objection to the evidence. The probative value of the evidence clearly outweighed any prejudice.

lution or the judge's conclusion that the evidence was relevant.[6]

But even if the admission of the fact of where the money was found was error, there can be no question that the error was harmless. Substantial direct evidence linking Williams to the crime had been given to the jury, including some very clear pictures of the robbery in progress. As the court recites, some two hours after the case was submitted to the jury, the foreman requested that the jury be permitted to view Williams. Accordingly, the trial judge directed appellant, over defense counsel's objection, to approach the jury box and face the jurors. The jury then retired and 21 minutes later returned a guilty verdict. This chronology suggests that the identification issue was the jury's principal concern. Indeed, an examination of the bank photos suggests that a viewing of the frames and a comparison to Williams would be the best way to resolve the question of guilt,[7] after weighing and deciding the credibility of Williams's alibi witnesses. More than ten of the 71 frames in which Williams appears unmistakably depict the robbery participant alleged to be Williams in full face and profile views. The court itself says "the photographs are reasonably clear" and that "the resemblance between appellant and the person alleged to be him in the bank photos is not far-fetched." Opinion at 8. The court adds, however, that the jury was "troubled by the issue of identity," and speculates that some jurors might not have been able to vote to convict without knowing where the money was found. However, this is sheer speculation by the court in disregard of the appellate court's long-standing role:

> It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there is substantial evidence, taking the view most favorable to the Government, to support it.

*Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).[8] There was substantial direct evidence—which the court minimizes unbelievably—that Williams was the robber. I ask, what more proof could be required than positive identification by two eyewitnesses and the coat that Williams wore when robbing the bank? If these were not sufficient to support a clear film of the robbery, then the banks might as well stop taking surveillance pictures.

In light of the dim view the court has of the bank film, the weight it places upon the two witnesses who could not positively identify Williams, and the lack of weight it ascribes to the two eyewitnesses who did identify Williams and to the coat, it might be advisable to avoid a retrial of Williams unless Wolford will testify against him. The court's conclusions in its discussion of harmless error suggests, without directly articulating it as such, that without Wolford's testimony tying Williams to the money, sufficient proof of Williams's guilt does not exist. On the basis of the evidence presented below, it is difficult to imagine

---

**6.** The general rule has been stated before in this circuit:

> Ordinarily a ruling on the relevancy of evidence depends upon the exercise of the sound discretion of the trial judge and will not be disturbed on appeal except for grave abuse.

*Hardy v. United States,* 118 U.S.App.D.C. 253, 335 F.2d 288, 289 (1964).

**7.** The court characterizes, in Footnote 7 and its related text, comments made by the prosecutor in closing argument as, in effect, apologies for lack of clarity in the photos. While I will admit some immaturity in the prosecutor's method, I do not interpret the argument as does the court. He seems to me to be laying groundwork for his later emphasis upon the eyewitness testimony by indicating that the prosecution's case does not rest completely on the photos. It is worth noting that the prosecutor did not once say that the pictures were unclear, inaccurate, or anything other than an unanswerable portrayal of Williams and Wolford robbing the bank. Perhaps Wolford thought so too.

**8.** Of course, a degree of this presumption must be taken away when it is concluded that error was committed below. I do not believe, however, that minor evidentiary error, for which objection by defense counsel was not timely made, requires that the case be turned completely around or that every presumption must then be made in the appellant's favor.

any other means of establishing an adequate foundation linking Williams with the money.

I, therefore, dissent.[9]

Before BAZELON, Chief Judge, and WRIGHT, McGOWAN, TAMM, LEVENTHAL, ROBINSON, MacKINNON, ROBB and WILKEY, Circuit Judges.

## ORDER

On consideration of the *sua sponte* suggestion for rehearing *en banc* and a majority of the judges of the court in regular active service not having voted in favor thereof, it is

ORDERED by the court, *en banc*, that the aforesaid *sua sponte* suggestion for rehearing *en banc* is denied.

Statement of Circuit Judge MacKINNON, in which Circuit Judges TAMM, ROBB and WILKEY join, is attached.

## STATEMENT OF JUDGE MacKINNON

MacKINNON, Circuit Judge:

I have voted to rehear this case *en banc* in order to maintain the uniformity of our decisions. Fed.R.App.P. 35(a).

### I

Justice Clark's dissent alone sets forth an adequate basis for rehearing *en banc*. The following additional reasons also exist.

Sprinkled throughout the majority opinion are understatements of facts which do not fairly reflect the strength of the circumstances that are probative of guilt, and comments are made on the Government's theory that do much less than justice to the

Government's position. For example, at page —— of 182 U.S.App.D.C., at page 863 of 561 F.2d the majority opinion states "[t]he prosecutor's closing argument casts considerable doubt on any claim that the photographs here were decisive." This is an unjustifiable attempt to characterize the Government as representing that its case was weak. But the reason given is an insufficient one for reversing the jury's verdict because the photos do not have to be "decisive."

> The Government pointed out that this is an unusual case in that you almost have a movie of this whole robbery because there are over two hundred frames, that means individual pictures of these two reels of films that I have. . . .
> Pay very careful attention to them, ladies and gentlemen.[1] But *they are not the most crucial element in this case . . .*[2] (Emphasis added.)

(Closing Argument Tr. 3). Guilt thus in the Government's view never depended on the photographs being "decisive." Actually the Government's case rested on *all* the evidence: (1) the photographs,[3] the visual identifications (Tr. 175, 176), (3) the coat (jacket) and (4) the money (Closing Argument Tr. 9, 12), and the relationship of each to the other.

Even if there was no other evidence of guilt the law does not compel a conclusion that the *jury* could not consider the pictures as decisive, particularly in relation to other aspects of the proof of guilt. *The pictures of the coat alone could have been decisive* as a practical matter. Williams was arrested on December 3, 1974, fifteen days after the bank robbery. When arrested he was wearing a coat (jacket) that *exactly*

---

9. I am reminded of a ditty of my childhood: Mother, may I go out and swim. Yes, my darling daughter. Hang your clothes on a hickory limb, but don't go near the water.

1. For the prosecutor to ask the jury to "[p]ay very careful attention to them [the pictures of the robbery]" is not supportive of any claim that the prosecutor viewed this evidence as being weak.

2. This is an honest effort by the prosecutor to honestly portray to the jury the proper rela-

tionship of the photographs to the other evidence of guilt.

3. Actually the photographs were a sufficient likeness to establish identity. After the photographs of the robbery were developed a detective on the police force viewed them and thereby identified Williams immediately as he was familiar with him from a case he had worked on in the 60's. Reference to that case produced Williams' name (Tr. 18).

matched the coat in the pictures (Closing Argument Tr. 26). The majority opinion fails to state this vital fact, this being another instance where it attempts to play down the evidence of guilt. This jacket was introduced as Government's Exhibit 1d. Personal examination of the jacket exhibit and comparison with the photographs of the robbery discloses the following: The snaps the jacket used in lieu of buttons have the *exact* same metallic color and are *exactly* the same size, and are located in *exactly* the same places that would result in the reproduction that appears in the photographic exhibits. The style and length of the jacket are *exactly* the same in every particular. The flaps on the two breast pockets are cut in *exactly* the same scalloping design that are reproduced in the photographic exhibits; the collar with the long points is *exactly* the same as reproduced in the photographic exhibits. In other words, the jury might have relied on the jacket alone, when compared with the pictures, as the decisive indication of guilt.[4]

> The Government argued to the jury: We are urging you, ladies and gentlemen, to consider that the testimony of Mr. Higdon and Miss Sachs [identification witnesses] is actually as probative and is as important in this case as these photographs.

(Closing Argument Tr. 4). From this it is apparent that the Government did not contend that the photographs were "decisive." After reading this argument it is obvious that the majority opinion is incorrectly representing the record when it states:

> [The prosecutor] followed every mention of the photographs with a suggestion that the jury consider the testimonial evidence, *rather than the photographs*, as the primary evidence.

Maj. op. at —— of 182 U.S.App.D.C., at 863 of 561 F.2d (emphasis added). The prosecutor's argument (*supra*) clearly

placed the evidence of the eyewitness identifications and the photographs on the same basis; not that the jury should look to the identification testimony and not to the pictures (as is indicated by the statement that the testimonial evidence should be considered "*rather* than the photographs.") But whether one class of evidence was more persuasive than other evidence is not of controlling importance here. What is apparent is that Williams was clearly shown to be a principal participant in the bank robbery by *all* the evidence.

## II

The defense offered several alibi witnesses. The majority opinion so states (Maj. op. at —— of 182 U.S.App.D.C., at 863 of 561 F.2d), but it fails to state that all the alibi witnesses (who testified that Williams was attending a birthday party for his niece's son at noon when the bank was robbed) were fatally impeached. Each one of them contradicted each other on some principal point concerning the alleged birthday party. One witness said Williams' hair was maybe a little longer on the sides and he had a mustache but the mustache only came down to around the lip area. The other alibi witness said he didn't have any hair and he didn't have any mustache. A third witness agreed that he looked "like the Ray Williams that you see before you today [in court]" (Tr. 272). Actually, he had shaved his head and mustache after the robbery and before his arrest and lineup (*cf.* Tr. 102, 229, and photographic Exhibits 2, 3, frames of entire robbery, Ex. 4, lineup, Ex. 8, individual photos when arrested, Tr. 104, 185, 222). The comparison of appellant with the pictures of the robbers was for the jury to make and an appellate court has no way of evaluating their identification. They were evidently very conscientious in this responsibility because after they were allowed to see the photographic exhibits in the jury

---

4. The majority opinion attempts to indicate that a Government witness was in error in describing a "waist-length vinyl jacket" as a "*London Fog* type"—presumably because of some difference in color, but the witness, a former clothing salesman at Raleigh Haber-

dasher in Washington (Tr. 136), who was "familiar with London Fog products" (Tr. 139) indicated he referred to it being "well-cut and three-fourths length" (Tr. 140). And corduroy "[i]f you look at it in a certain way . . . can resemble vinyl" (Tr. 139).

room they returned to the courtroom and had the defendant stand before them, obviously so they could make, or not make, their own identification. *See United States v. Skinner*, 138 U.S.App.D.C. 121, 425 F.2d 552 (1970).

The alibi witnesses also differed in their testimony as to the coming and going of the parties. Sharon McLean testified that her uncle, Williams, left first, then Rhoda Johnson and then Pat Corley (Tr. 244). Rhoda Johnson testified that she and Williams left together (Tr. 276). Also, the willingness of the alibi witnesses to testify to remembering in the minutest detail practically everything they did on November 19, 1974, was enough to shake any person's confidence in their testimony. It was thus rather apparent, as the jury obviously found, that the alibi witnesses were testifying falsely in some particulars.

The great lengths to which the majority opinion goes in its attempt to dredge up evidence to strengthen the completely impeached testimony of the alibi witnesses is reflected in the following statement:

> Their recollection [that of the alibi witnesses] was corroborated by the introduction into evidence of *Nathaniel's birth certificate*.

Maj. op. at —— of 182 U.S.App.D.C., at 861 of 561 F.2d (emphasis added). The reasoning of the majority opinion in this respect proceeds as follows:

1. Witnesses who testified that Williams was with them on November 19, 1974, recalled that the occasion was a birthday party for Nathaniel.
2. Nathaniel's birthday, as proved by his birth certificate, was November 19th.
3. Therefore the birth certificate supports the witnesses' recollection that they were at a party with Williams on November 19th.

The logical fallacy in this syllogistic presentation is that of *non sequitur* because the conclusion does not really follow from the premises by which it is supposed to be supported. The introduction of the birth certificate only proves that Nathaniel had a birthday on the same day as the bank robbery. It might, at the most, furnish a reason as to why the witness might remember the day, but that does not corroborate that they correctly recall that Williams was present—the critical point—or even that they were present at a party. The logic behind the statement of the majority opinion in this respect is the same as that of the robber who testified he could not have been at the bank when it was robbed because at that time he remembered he was four miles away riding a white horse, and here is the white horse to prove it. Defense lawyers occasionally make this illogical argument to juries but this is the first instance to my knowledge of its acceptance by an appellate court.

### III

Currency to the amount of $995 *positively identified as the proceeds of the robbery* was found in the apartment of Williams' sister Gloria. Gloria was the common law wife of the other robber, Wolford, who had previously entered a guilty plea to the crime. Gloria took the stand and stated that her brother did not live in her apartment, and did not frequent her apartment (Tr. 221), but *she never went so far as to say he had not been there*. In fact, she testified that she "saw *very little* of him [Williams] around that time [of the robbery]" (Tr. 219–20) (emphasis added), which is an indication that she *did* see him on some occasions "around that time." With such evidence, and the lack of any evidence that she did *not* see him, the weight to be given to finding the money in her apartment was for the jury.

> The court charged the jury:
> Mr. Wolford is not in this case and you should not concern yourselves about Mr. Wolford. Tr. 208.

This was a proper charge because Wolford was not on trial. The defense did not object to this charge. If the defense had wanted a different charge they could have requested it. If the defense considered that the charge was improper the defense could have objected to it; but having failed to do either precludes the court raising the point

at this time. Actually, it is an evenly balanced question as to which tack was most beneficial to the defendant. The conviction should not be set aside because the defense chose one route rather than another. Both were detrimental to his case.

But the majority holds that Williams' conviction must be reversed because the evidence of his connection with his sister's apartment was not sufficiently proved to be relevant and "because the jury was not also told that one occupant of the apartment had pleaded guilty to the bank robbery" (Maj. op. at —— of 182 U.S.App.D.C., at 865 of 561 F.2d). But his sister's statement that she saw "very little" of him "around the time" of the bank robbery, was a sufficient circumstance to establish relevance. As for telling the jury that Wolford had entered a guilty plea to the crime, one cannot imagine anything to which the defense would have a greater objection. If that evidence came in, all the prosecution need do would be to subpoena Wolford as a witness, let the jury see him and compare his physical presence with the picture and then Williams' conviction would be doubly assured. The plea of guilty by Wolford would establish the authenticity of the pictures and Williams' conviction would be practically automatic because of his relations with Wolford and the finding of the money where he lived. Actually more than the "money" had been found in Gloria's apartment. The Government also proffered "positive" testimony from two witnesses, one a former weapons' expert for nineteen years with the Navy (Tr. 211), that a .22 caliber revolver also found in Gloria's apartment (Tr. 109), where Wolford lived, was "identical" to the revolver *Williams* (not Wolford) used in the bank robbery (Tr. 105, 112–113). When the defense objected to this testimony the court sustained the objection (Tr. 119). The basis for the objection to introducing the gun and the money involved the same claim of prejudice, to wit, that it tied Williams too close to Wolford, who had plead guilty. As Williams' counsel stated:

> MR. STILLER: By proving that Mr. Wolford did it, which has been admitted.

I find myself between Scylla and Charybdis, because of what is very low relevant evidence, low in relevance—

> THE COURT: I think it is very highly relevant.

> MR. STILLER: I disagree with the Court. I have to make my objection because I think—

> THE COURT: You have made your objection.

. . . . .

Tr. 117.

With this background of Williams' counsel objecting to the gun and the money because they both brought in Wolford, it is hard to see how Williams would not object to telling the jury that Wolford had entered a guilty plea to the bank robbery that involved *two* robbers. For the court to reverse on this theory is completely fantastic. The defense would never have failed to object to such evidence. The Government had previously agreed not to call Wolford as a witness (Tr. 116), but as the court pointed out the defense could have called him (Tr. 117). *The defense objected to calling Wolford*:

> MR. STILLER: I don't think it is my part that I have to defend someone else's case and prove—I don't have to prove that the defendant didn't do it. That is what I am being put in the position—

Tr. 117. Thus, defense counsel objected to Wolford being injected into the case to that extent and would further object to the jury being told that Wolford has admitted his guilt. Counsel would view the decision of the majority as being adverse to the interests of the defendant—when judges protect defendants' rights in that manner, who needs prosecutors? And the weird decision of the majority is no more acceptable to the Government after the jury returned a guilty verdict without such evidence being introduced. It thus seems that neither party will agree with the decision—truly a remarkable accomplishment.

## IV

There are also a number of incidental points:

When Williams was arrested he gave a false name, "Richard Johnson" (Tr. 180), and insisted that "Richard Johnson" was his name for a considerable period of time (Tr. 180–81). After the robbery he also shaved his head and his mustache (*compare* Tr. 29, 102 *with* Tr. 103–104) in an obvious attempt to escape eyewitness identification. Each of these circumstances could be found by the jury to constitute strong evidence of consciousness of guilt.

There is a complete photographic record of the robbery from start to finish—about 170 developed pictures. In keeping with its tactic of poor-mouthing the Government's strong evidence of guilt the majority opinion negatively characterizes the eyewitness identifications:

> *Only two* of the four eye-witnesses who attended line-ups in which Williams was present identified him as the robber.

(Maj. op. at —— of 182 U.S.App.D.C., at 863 of 561 F.2d, emphasis added). In this manner the majority attempts to inject as a negative factor the fact that some "eyewitnesses" did not identify Williams. What the majority fail to state is that two eye-witnesses did testify to *positive* identifications (Tr. 91, 103, 143–144, 152–153, 163, 166) and one of the other witnesses who only saw one robber (Tr. 212) focused on his gun and jacket (Tr. 210–211), not his face (Tr. 215) in the few moments before he was compelled to lie on the floor. It is not unusual for some victims in a robbery to be unable to honestly identify all the bank robbers, especially where, as here, following a sudden order from the robbers, the victims quickly lie down on a bank floor, and are unable to get a good view of the robbers. The majority opinion unjustifiably attempts to make a point of the witnesses who did *not* identify the robbers. That is not viewing the evidence, as an appellate court must, in a manner most favorable to the jury. The jury's verdict indicates that the fact that some victims did not identify Williams, did not detract from the value of the witnesses who were able to identify him positively as one of the robbers. Under long settled limitations on appellate courts it was impermissible for the majority to degrade this evidence.

The defendant objected to the introduction of the gun into evidence because "This is such a strong case" (Tr. 197). The majority opinion characterizes it as a "close case." Maj. op. at —— of 182 U.S.App.D.C., at 864 of 561 F.2d. This is another example of the tactics used by the majority opinion to incorrectly characterize the strength of the evidence against Williams. The case is only "close" if one takes away the evidence upon which the jury was entitled to rely, and obviously did, and impermissibly whittles it away and misstates its probative value as evidence of guilt.

## V

The opinion of the court sets aside the verdict of the jury and vacates the judgment of conviction contrary to substantial justice and, even if it were to be admitted that some error had been committed at the trial, it is erroneous to vacate the judgment because the alleged error does not affect the substantial rights of the parties. The applicable Rule provides:

> *Harmless Error.* Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded.

Fed.R.Crim.P. 52(a). This is a reinforcement of the statute:

> On the hearing of any appeal . . . the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

28 U.S.C. § 2111 (1970), 63 Stat. 105 (1949). The Supreme Court in interpreting this same provision stated:

> [I]f, upon an examination of the entire record, substantial prejudice does not appear, the error must be regarded as harmless.

*Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

The majority opinion throughout also violates the uniformity of our decisions which hold that on appeal from a judgment of conviction in a criminal case the appellate court is required to view the evidence in the

light most favorable to the Government making full allowance for the right of the trier of fact to assess the credibility of witnesses and to draw justifiable inference from the evidences. *Thompson v. United States*, 132 U.S.App.D.C. 38, 405 F.2d 1106 (1968); *Crawford v. United States*, 126 U.S. App.D.C. 156, 375 F.2d 332 (1967); *Curley v. United States*, 81 U.S.App.D.C. 389, 160 F.2d 229, *cert. denied*, 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

The time has come for this court to confront the fact that it cannot permit panels to disregard Fed.R.Crim.P. 52(a), *supra*, and the rule that the evidence on appeal *must* be considered in the light most favorable to the jury's verdict. This is probably the most basic rule for an appellate court to follow in a criminal appeal. By ignoring the jury's prerogatives, facts are distorted, even-handed justice is denied, judges assert facts on a selective basis and obviously guilty defendants, who were properly convicted, have their convictions reversed and in too many instances because of such reversals are thereafter improperly freed to continue their depredations against society.