379 S.E.2d 388

**John BENNETT**

v.

**3 C COAL CO. and Consolidation Coal Co.**

**No. 17962.**

Supreme Court of Appeals of West Virginia.

March 13, 1989.

---

W. Warren Upton, Stephen B. Farmer, J,K,H & O'F, Charleston, for appellant.

Brown H. Payne, Wilbert A. Payne, Payne & Payne, Beckley, Franklin D. Cleckley, Morgantown, for appellee.

MILLER, Justice:

Consolidation Coal Company (Consol) appeals from a judgment of the Circuit Court of Wyoming County denying its motion to set aside the verdict, or, in the alternative, to grant a new trial, in a civil action seeking damages for the disturbance of graves in a family cemetery due to mining subsidence. The plaintiff, John Bennett, was awarded $250,000 in compensatory damages and $500,000 in punitive damages. Consol assigns a number of errors. For the reasons that follow, we reverse the judgment of the circuit court and remand for a new trial on the issue of damages.

## I.

The plaintiff in this rather unusual case alleged that Consol's mining operations [1] underneath a "family cemetery" caused subsidence and the disturbance of the graves of his relatives. The evidence indicated that many years ago, the plaintiff's father had leased farmland located in Wyoming County from the Pocahontas Land Company. It had been his father's wish that he and other members of the family be buried at a particular location on this property. Upon his death, the plaintiff's father was buried at that location, and over some fifty-eight years, about seventeen family members and relatives were buried in this area at sites selected by the plaintiff.

The most recent burial at this family cemetery occurred in 1981, some five years prior to the trial of this case. Most of the

---

1. The mining operations were actually conducted by 3 C Coal Company, which had apparently filed for bankruptcy by the time of trial. Consol did not contest its responsibility for the actions of 3 C Coal Company.

plaintiff's family members, including his father, mother, a brother, two sisters, and one son, are buried in the cemetery. The plaintiff, who was eighty-five years old at the time of trial, lived near the cemetery and had maintained it throughout the years.

The plaintiff testified that he first discovered cracks and holes in the graves when he visited the cemetery on July 30, 1983. Shortly after this discovery, he went to Consol's office in Wyoming County and talked with a company representative about what he had found. According to the plaintiff, the representative acknowledged that Consol had mined in the vicinity of the cemetery. A few days later, the representative came to the plaintiff's home and offered immediately to fill the cracks and holes with dirt and to plant grass seed.

The plaintiff's testimony was corroborated by a letter from a surface mine reclamation inspector, then employed by the Department of Natural Resources, who had investigated the conditions at the cemetery in response to a complaint by the plaintiff. The inspector's letter indicated that Consol had agreed, on a one-time basis only, to fill the cracks in the vicinity of the cemetery and to sow grass seed, but had not admitted any responsibility for the possible subsidence. The inspector stated that he had found no evidence of impropriety on Consol's part and noted that mining maps indicated a block of coal had been left under the cemetery.

The plaintiff's son, who had been a coal miner for thirty-two years, testified as an expert in underground mining. He was permitted to testify, over objection, that in his opinion the cracks had been caused by the coal being "mined out" from underneath the cemetery, which resulted in the roof of the mine caving in. He further testified that the subsidence might continue if the underground mining cavity had not become completely filled.

A second coal miner, unrelated to the plaintiff and with over thirty years of experience in the mines, testified that he had been to the cemetery many times and that the cracks may have been caused by underground mining. He also had observed that the cracks were increasing both in width and in length. The plaintiff also introduced the testimony of a surveyor, who expressed the opinion that a crack at the front of the cemetery definitely resembled cracks he had observed in the past that had been apparently caused by mining subsidence.

The plaintiff testified that he had experienced anxiety and had lost sleep as a result of thinking about the disturbance of the graves of his family members. Several of his children and other relatives testified that he had become very distressed and upset about the conditions of the graves at the cemetery. This matter had become the uppermost concern in his life and had prompted him to write letters and to speak about little else. A number of these witnesses testified that they had seen holes and cracks in the cemetery which were gradually increasing in size.

The plaintiff's daughter testified that she believed the graves should be moved because of the subsidence. This would require an exhumation of the bodies and the purchase of burial plots and coffins. The plaintiff's sister testified that the plaintiff also wanted to move the graves because of the condition of the cemetery.

Consol introduced the testimony of four witnesses. The reclamation inspector who had conducted the investigation in 1983 testified that he had observed no subsidence-related cracks in the cemetery disturbing graves, although he was of the opinion that one crack at the front of the cemetery may have been produced by mining subsidence. The inspector stated that Consol's mining maps indicated a block of coal had been left under the cemetery as required by state mining requirements. A section foreman who had worked in the mining operation around the cemetery testified that, to his knowledge, that part of the operation had been completed around September, 1972. He also testified that he had, at some unstated point in time, been in the coal mine and observed a block of coal remaining under the cemetery.

A mining engineer also testified concerning the mining map and indicated that a block of coal in front of the cemetery had been removed in September, 1982. He had not been in the mine to observe whether the block of coal shown on the map had, in fact, been left underneath the cemetery. An engineer employed as a regional manager of engineering and environmental affairs by Consol was the final defense witness. He testified from company records that the mining activity around the cemetery involved the Beckley seam of coal, which was about four feet thick and was located approximately 200 feet below the cemetery. Based on his experience with the full seam extraction utilized at this mining operation, the engineer stated that subsidence normally occurs within the first few days or weeks after the pillars of coal are removed. Based upon his review of mining records and inspection of the cemetery, he was of the opinion that only one crack, located at the front of the cemetery approximately twenty feet from the nearest grave, was possibly caused by mining subsidence.

## II.

■ Before discussing the assignments of error, it is useful to review some of the general principles developed in this area of the law. The right one acquires in a cemetery lot is in the nature of a perpetual easement, as we pointed out in *Sherrard v. Henry,* 88 W.Va. 315, 320, 106 S.E. 705, 707, 21 A.L.R. 645, 649 (1921): "There is no doubt but that one who acquires a cemetery lot has some interest therein. He does not acquire the fee in the land. His interest is more in the nature of a perpetual easement, and it is likewise true that the exercise of this right is subject to the police power of the state."

Furthermore, in Syllabus Point 4 of *Sherrard,* we outlined how it is possible to acquire a cemetery lot through adverse possession:

"It is not necessary in order to the acquirement of a right in a burial lot by adverse possession that the same be fenced. If the limits of such claim are clearly defined by improvements upon the lot and by a slight barrier or ridge extending all the way around the same, and so maintained for the period of ten years, clearly indicating the extent and nature of the claim, it will be sufficient to confer the right by adverse possession."

*See also Brunton v. Roberts,* 265 Ky. 569, 97 S.W.2d 413 (1936); *Heiligman v. Chambers,* 338 P.2d 144 (Okla.1959); *Forest Home Cemetery Ass'n v. Dardanella Fin. Corp.,* 329 N.W.2d 885 (S.D.1983); 3 Am. Jur.2d *Adverse Possession* § 265 (1986); Annot., *Private or Family Cemeteries,* 75 A.L.R.2d 591 (1961); Annot., *Adverse Possession or Prescription in Respect of Burial Lot,* 107 A.L.R. 1294 (1937).

■ In *England v. Central Pocahontas Coal Co.,* 86 W.Va. 575, 104 S.E. 46 (1920), we also recognized that near relatives have a cause of action for damages for desecration of a grave or body, even though they have no property interest themselves in the land where the bodies are buried, because the bodily remains are accorded a species of property right. As we stated in Syllabus Points 1 and 2, in part:

"1. While strictly considered there is no right of property in a dead body, nevertheless the right to bury a corpse and preserve the remains is a legal right, which in this country is regarded as a quasi right in property, the violation of which is cognizable in and may be redressed at the suit of near relatives by an action on the case against the wrongdoer.

"2. Whether such right of burial exists by deed or by mere license, so long as it exists and is not lawfully revoked or destroyed, it may be ... redressed and protected in our courts[.]"

In *England,* the plaintiffs sought to recover for the mental anguish caused by the defendant's disinterment of their loved ones' remains. More recently, in Syllabus Point 3 of *Whitehair v. Highland Memory Gardens, Inc.,* 174 W.Va. 458, 327 S.E.2d 438, 53 A.L.R.4th 383 (1985), we discussed this element of damages: "A cause of action for negligent or intentional mis-

handling of a dead body does not require a showing of physical injury or pecuniary loss. Mental anguish is a sufficient basis for recovery of damages."

Admittedly, the present case differs factually from *Whitehair*, where the defendant, who had permission to disinter and rebury the bodies because of highway construction across the old cemetery, was charged with negligently having lost some of the bodies. Here, the facts are more analogous to *England*, where the bodies in a private cemetery were unlawfully disturbed.[2] However, courts have allowed similar suits for damages for disturbing a graveyard even though the bodies are not disturbed. At least one court has recognized such right of recovery where the surface of the grave was cracked because of the coal being removed under the surface. *Nichols v. Woodward Iron Co.*, 267 Ala. 401, 103 So.2d 319 (1958). *See also Fergerson v. Utilities Elkhorn Coal Co.*, 313 S.W.2d 395 (Ky.1958) (dumping coal refuse on graves); *Growth Properties I v. Cannon*, 282 Ark. 472, 669 S.W.2d 447 (1984) (construction of temporary access road over graves); *Dennis v. Keillor*, 105 Mich.App. 463, 306 N.W.2d 324 (1981) (damage to tombstone); *Perry v. Cullipher*, 69 N.C.App. 761, 318 S.E.2d 354 (1984) (damage to gravestone); 14 Am.Jur.2d *Cemeteries* § 40 (1964); Annot., *Action at Law for Desecration of Grave*, 172 A.L.R. 554 (1948).

### III.

Consol's first assignment of error is that there is no cause of action for disturbance of a grave site unless it is shown that the body buried therein has also been disturbed. While we have not had occasion to make a specific holding on this point, it is clear from the foregoing cases and general authorities that a cause of action will lie for the unlawful desecration of a grave site even though no disturbance of the body interred therein can be shown.

### IV.

Another assignment of error involves the question of whether damages for mental distress may be recovered for unlawful disturbance of a grave site when no physical disturbance of the body buried therein can be shown. Consol places considerable reliance on our recent *Whitehair* case, wherein we quoted Prosser & Keeton on Torts 362 (5th ed. 1984), for the proposition that damages for emotional distress can be obtained for negligent mishandling of a dead body.[3] The argument is made that courts should not apply the same rule to the desecration of a grave site where there is no physical disturbance of the body buried therein.

Despite some conceptual differences in theories underlying a cause of action for negligent disturbance or mishandling of a dead body[4] and the desecration of a grave site, there is a unifying rationale for both

---

2. *England* had an additional factual feature in that the bodies were allegedly removed and buried in another location unknown to the heirs.

3. The relevant passage from Prosser & Keeton, *supra*, quoted in *Whitehair*, 174 W. Va. at 463, 327 S.E.2d at 443, states:

   "In two special groups of cases, however, there has been some movement to ... allow recovery for mental disturbance alone.... *The other group of cases has involved the negligent mishandling of corpses.* Here the traditional rule has denied recovery for mere negligence without circumstances of aggravation. There are by now, however, a series of cases allowing recovery for negligent embalming, negligent shipment, running over the body, and the like, without such circumstances of aggravation[.]" (Emphasis added; footnotes omitted).

4. In earlier cases, much of the struggle with recognizing a cause of action for disturbing a dead body was the fact that at common law, there was no right of property in a dead body. We discussed the historical origins of this cause of action in *England*, 86 W. Va. at 577–78, 104 S.E. at 47, and in *Whitehair*, 174 W. Va. at 460–461, 327 S.E.2d at 440–41. The cause of action for disturbance or desecration of a grave site did not have the same conceptual problems because the grave site partook of an interest in real property and, therefore, an action in trespass would lie. P. Jackson, *The Law of Cadavers* 362 (2d ed. 1950); 14 Am.Jur.2d *Cemeteries* § 40 (1964). *See generally* Annot., *supra*, 172 A.L.R. 554. In a given case, both theories may be present as in *England*, where the grave sites were not only unlawfully invaded, but the bodies were unlawfully disturbed and removed.

causes of action. This rests in the civilized belief that the dead should be venerated and that their burial place should be sacred and should not be unlawfully disturbed. Implicit in this belief is the recognition that family members will suffer mental distress if either the bodies or the grave sites of their loved ones are disturbed or desecrated. The reasons for recognizing a claim for mental distress for negligent handling of dead bodies, *see* note 3, *supra,* obviously apply to desecration of graves: "What all these cases appear to have in common is an especial likelihood of genuine and serious mental distress, arising from the special circumstances, which serves as a guarantee that the claim is not spurious." Prosser & Keeton, *supra* at 362.

■ There are cases where the courts have characterized the conduct as intentional, outrageous, and reckless, but this is because the damage claim is for emotional distress under the tort of outrageous conduct. *Whitt v. Hulsey,* 519 So.2d 901 (Ala. 1987); *Growth Properties I v. Cannon, supra.* It would seem more fitting to recognize the mental distress exception arising from disturbance or desecration of dead bodies and grave sites. *E.g., Robinson v. Providence Mausoleum, Inc.,* 359 So.2d 1317 (La.App.1978); *Dennis v. Keillor, supra; Perry v. Cullipher, supra; Matthews v. Forrest,* 235 N.C. 281, 69 S.E.2d 553 (1952). We, therefore, conclude that damages for mental distress may be recovered by the next of kin for the disturbance or desecration of a relative's grave.

### V.

■ We do not agree with Consol's argument that there was no proof of negligence. The jury had sufficient evidence before it to find that the conditions at the cemetery were caused by the failure of the defendant to leave sufficient pillars underneath the cemetery to prevent subsidence. The cemetery had been there for over fifty years. The cracks and holes appeared within just a few months after the defendant ceased mining operations in that area of its deep mine.

■ Our rule for determining the sufficiency of the evidence in a civil case is stated in Syllabus Point 5 of *Orr v. Crowder,* 173 W. Va. 335, 315 S.E.2d 593 (1983), *cert. denied,* 469 U.S. 981, 83 L.Ed.2d 319, 105 S.Ct. 384 (1984):

"In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved."

*See also* Syllabus Point 3, *Vercellotti v. Bowen,* 179 W. Va. 650, 371 S.E.2d 371 (1988); Syllabus Point 6, *McClung v. Marion County Comm'n,* 178 W. Va. 444, 360 S.E.2d 221 (1987); Syllabus Point 2, *Miami Coal Co., Inc. v. Hudson,* 175 W. Va. 153, 332 S.E.2d 114 (1985). Sufficient evidence existed here for the jury to find that Consol had negligently failed to leave sufficient coal underneath the family cemetery to prevent subsidence, causing the concomitant disturbance to the graves of the plaintiff's relatives.

### VI.

■ We do agree with Consol's contention that the evidence, when viewed in the light most favorable to the plaintiff, did not justify the punitive damage award. Our law has long required more than a showing of simple negligence to recover punitive damages. We fully discussed the origins of punitive damages in *Wells v. Smith,* 171 W. Va. 97, 297 S.E.2d 872 (1982), and stated that in order to secure punitive damages, the defendant must be shown to have engaged in "a wilful, wanton, reckless or malicious act." 171 W. Va. at 101, 297 S.E.2d at 875. Here, there is simply no proof of such acts on the part of Consol.

### VII.

Another ground of error is that the plaintiff's counsel was permitted in both his

opening statement and closing argument to state the amount the plaintiff was suing for. Although the plaintiff argues that the defendant did not make a sufficiently explicit objection, we find to the contrary.

Both Rule 46 of the West Virginia Rules of Civil Procedure [5] and Rule 103(a)(1) of the West Virginia Rules of Evidence [6] apply to the making of objections at trial and require specification of the grounds for the objection if the specific ground was not apparent from the context. This rule is not substantially different from our traditional rule regarding nonjurisdictional error stated in Syllabus Point 6 of *State v. Byers*, 159 W. Va. 596, 224 S.E.2d 726 (1976): "This Court will not consider an error which is not preserved in the record nor apparent on the face of the record." *See also* Syllabus Point 11, *State v. McFarland*, 175 W. Va. 205, 332 S.E.2d 217 (1985).

█ In this case, counsel for the plaintiff concluded his opening statement by saying, "This is a suit for five hundred thousand dollars compensatory damages because of what Consol has done and...." Whereupon, defense counsel objected: "We would object to any mention of monetary amount." The court overruled the objection, and plaintiff's counsel went on to state, "And we are also asking five hundred thousand dollars punitive damages because this was an act done by them intentionally, knowingly and wilfully."

Prior to the beginning of the closing arguments, defense counsel requested that the plaintiff's attorney be foreclosed from mentioning any monetary amounts, but was overruled by the court.[7] In his closing argument, plaintiff's counsel again referred to the damage figure: "[I]f it was done negligently, wilfully, then he should be compensated up to five hundred thousand dollars. That, ladies and gentlemen, is your duty."

On appeal, the plaintiff points out that there was no objection to this last remark. However, we believe that the precise objection made immediately before the beginning of the closing argument was sufficient to preserve the error, particularly in view of the court's ruling that he would permit plaintiff's counsel "to tell the jury, if you choose to do so, what the amount of the lawsuit was in the case."

The plaintiff cites two cases dealing with motions in limine, claiming they required an objection to the remarks at the time the

5. Rule 46, W.Va.R.Civ.P., provides:

"*Exceptions Unnecessary.* Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his ground therefor; and, if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him."

6. Rule 103(a), W.Va.R.E., provides, in part:

"*Effect of Erroneous Ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"(1) Objection.—In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context[.]"

7. The particular dialogue was as follows:

"MR. CAMERON: In arguing the amounts, I think it is prejudicial to the defendant to allow him to get up and argue he sued for five hundred thousand dollars punitive and five hundred thousand dollars compensatory damages in this case. I think he is entitled to argue whatever facts have been proven from the witnesses on the stand on damages in that regard and with relation to the pain and suffering that the jury is entitled to give him whatever it feels is a fair amount, but he is not entitled to suggest and set in their minds about five hundred thousand dollars.

"THE COURT: Overruled. You will be permitted to tell the jury, if you choose to do so, what the amount of the lawsuit was in the case.

"MR. PAYNE: The reason I will use it, if I say five hundred thousand dollars, it is so the jury cannot go over five hundred thousand dollars.

"THE COURT: As we all know the law in the State of West Virginia, they can return a verdict for any amount, and I think mentioning amounts in closing arguments is not per se error nor seriously prejudicial. I think our courts have held it is not recommended. I don't recommend specific amounts, but I do allow the amount set forth in the complaint."

plaintiff's counsel made his closing statement.[8] *E.g., State v. Clark,* 170 W. Va. 224, 292 S.E.2d 643 (1982); *Smith v. Holloway Constr. Co.,* 169 W. Va. 722, 289 S.E.2d 230 (1982). In *Clark,* we held that counsel was required to maintain an objection to the evidence when it was finally offered because the court had made no ruling on its admissibility before trial. In *Smith,* no objection was made to the court's in limine ruling foreclosing the plaintiff from offering certain evidence. We concluded that the failure to object waived the point on appeal.

Here, a specific ruling on the objection had been made when defense counsel raised the question before closing arguments. Furthermore, the defense's early objection to similar remarks in plaintiff's attorney's opening statement had been overruled by the judge. We believe that under these circumstances, it was not necessary to make a further objection to the plaintiff's counsel's statements at the time they were made to the jury in closing argument. As we recently stated in Syllabus Point 1 of *Wimer v. Hinkle,* 180 W. Va. 660, 379 S.E.2d 383 (1989):

> "An objection to an adverse ruling on a motion in limine to bar evidence at trial will preserve the point, even though no objection was made at the time the evidence was offered, unless there has been a significant change in the basis for admitting the evidence." [9]

*See also Schichtl v. Slack,* 293 Ark. 281, 737 S.W.2d 628 (1987).

From a substantive standpoint, we have dealt with this question of mentioning the amount sued for in several cases. One of the most thorough analyses was made by Justice Haden in *Abdulla v. Pittsburgh & Weirton Bus Co.,* 158 W. Va. 592, 611, 213 S.E.2d 810, 823 (1975), where he quoted initially from part of Syllabus Point 6 of his earlier case of *Jordan v. Bero,* 158 W. Va. 28, 210 S.E.2d 618 (1974), as follows:

> "This Court recently expressed disapproval of the practice of advising the jury concerning the monetary figures of the *ad damnum* clause. 'In the trial of negligence cases, the better practice is to withhold any monetary figure from the jury's consideration which might be suggestive of amounts not proven in evidence.'" [10]

He then went on to discuss the perils attendant to this technique when there are few special damages and no permanent injury: "[T]o introduce a purely speculative amount for the jury's consideration entails a very high risk in a case where permanent impairment is not proved." 158 W. Va. at 612, 213 S.E.2d at 823. In *Abdulla,* the plaintiff advised the jury of the amount sued for, but we found no reversible error,

---

**8.** We accept the motion in limine characterization, as such motions can be made before or during trial. *See Robinson v. State,* 309 N.E.2d 833, 854 (App.), *aff'd,* 262 Ind. 463, 317 N.E.2d 850 (1974).

**9.** In note 6 of *Wimer,* 180 W.Va. at 663, 379 S.E.2d at 386, we cited with approval note 6 of *Uptain v. Huntington Lab, Inc.,* 723 P.2d 1322, 1329–30, which outlined the division of authority on this issue as follows:

> "*Compare Rojas v. Richardson,* 703 F.2d 186 (5th Cir.1983) (motion in limine does not preserve error for appeal); *Northwestern Flyers, Inc. v. Olson Bro. Mfg. Co.,* 679 F.2d 1264 (8th Cir.1982); *Collins v. Wayne Corp.,* 621 F.2d 777 (5th Cir.1980); *United States v. Helina,* 549 F.2d 713 (9th Cir.1977); *People v. Stewart,* 140 Cal.App.3d 11, 189 Cal.Rptr. 141 (1983); *Douglas v. Lombardino,* 236 Kan. 471, 693 P.2d 1138 (1985); *Maricle v. Spiegel,* 213 Neb. 223, 329 N.W.2d 80 (1983); *State v. Leslie,* 14 Ohio App.3d 343, 471 N.E.2d 503 (1984); *Zeh-*

*ner v. Post Oak Oil Co.,* 640 P.2d 991 (Okla. App.1981); *Dailey v. Wheat,* 681 S.W.2d 747 (Tex.App.1984); *State v. Lesley,* 672 P.2d 79 (Utah 1983); *with American Home Assurance Co. v. Sunshine Supermarket, Inc.,* 753 F.2d 321 (3d Cir.1985) (motion in limine preserves error for appeal); *Sheehy v. Southern Pacific Transportation Co.,* 631 F.2d 649 (9th Cir. 1980); *Reyes v. Missouri Pacific Railroad Co.,* 589 F.2d 791 (5th Cir.1979); *United States v. Williams,* 561 F.2d 859 (D.C.Cir.1977); *Loof v. Sanders,* 686 P.2d 1205 (Alaska 1984); *State v. Lujan,* 136 Ariz. 326, 666 P.2d 71 (1983); *Harley–Davidson Motor Co. v. Daniel,* 244 Ga. 284, 260 S.E.2d 20 (1979); *State v. Foster,* 296 Or. 174, 674 P.2d 587 (1983); *State v. Kelly,* 102 Wash.2d 188, 685 P.2d 564 (1984)."

**10.** *See* Annot., *Propriety and Prejudicial Effect of Reference by Plaintiff's Counsel, in Jury Trial of Personal Injuries or Death Action, to Amount of Damages Claimed or Expected by His Client,* 14 A.L.R.3d 541 (1967).

as there was evidence of special damages and of permanent impairment and diminished capacity to work.

As indicated in Syllabus Point 6 of *Jordan,* the better practice is to avoid mentioning to the jury the amount sued for, but such disclosure alone may not be reversible error. However, in a case involving only damages for mental distress, disclosure of such information may result in reversible error where the verdict awarded is obviously influenced by such statement.

We find the error in this case to have been prejudicial for several reasons. First, as already pointed out, the entire damage award was predicated on the plaintiff's mental distress. Second, plaintiff's counsel mentioned the amounts sued for in both his opening statement and closing argument. Third, the jury's verdict was obviously influenced by such statements, as evidenced by the award of $250,000 in compensatory damages, one-half of the amount sought in the complaint, and $500,000 in punitive damages, the precise amount claimed by the plaintiff. Finally, the jury was never given any instructions as to how to assess either compensatory or punitive damages.

For the foregoing reasons, the judgment of the Circuit Court of Wyoming County is set aside and the case is remanded for a new trial on the issue of damages.

Reversed and Remanded.

McGRAW, J., participated and concurred in this decision, but departed from the Court prior to the preparation of the opinion.

WORKMAN, J., did not participate in the consideration or decision of this case.