# CHARLESTON.

## J. R. JENKINS v. CHARLESTON GENERAL HOSPITAL & TRAINING SCHOOL.

Submitted January 25, 1922.    Decided February 7, 1922.

1.  HOSPITALS—*Liable to Patient for Injuries Received from Incompetency or Negligence of Physician, Where Conducted for Private Gain.*

    A hospital conducted for private gain is liable to its patient for injuries sustained by him, in consequence of incompetency or negligence of a physician treating him at its instance, under a contract binding it to furnish him proper treatment. (p. 232).

2.  SAME—*Cannot be Absolved from Liability by Having a Stranger Perform Acts for it.*

    A physician so employed is not an independent contractor. One bound to performance of a duty by contract cannot absolve himself from such obligation by devolution of performance thereof upon, a stranger to it.   (p. 235).

4.   SAME—*Failure of Duty in Diagnosis is Inducement to Cause of Actionable Negligence.*

Failure of a hospital through its physicians and surgeons to treat its contract patient, within the period of its employ-ment, for part of a wound from which he is suffering, super-induced by negligent lack of discovery of such part, the in-vestigation not having extended to it at all, is actionable negli-gence and constitutes ground of liability for the consequent detriment, in the absence of contributory negligence on the part of the patient.   (p. 232).

4   SAME—*Failure of Duty in Diagnosis is Inducement to Cause of Action for Non-Treatment.*

Though the mere failure of duty in diagnosis, in such case, may constitute a breach of the contract and confer a right of action, it is only matter of premise or inducement, in an action for the damages resulting from non-treatment, and the injury and cause of action are continuous, while the relation of physician and patient subsists.   (p. 237).

5.   SAME—*Where Patient was Informed of Necessity for Further Diagnosis and Failed to Return, Liability for Negligence is Limited to Injury Occurring Before Plaintiff's Negligence.*

If, in such case, the patient, upon being competently ad-vised of the necessity of further diagnosis and treatment, within the period of such relation and within a reasonable time after the date of the wound, ignores it and neither re-turns to the hospital nor procures treatment elsewhere, until after the trouble has become irremediable, his right of re-covery is limited to such damages as accrued before his neg-ligence occurred, if the prior and subsequent damages can be separated by the jury.  p. 237).

6.   NEW TRIAL—*Court Should Set Aside Verdict Rendered on Erroneous Theory.*

A verdict for the plaintiff in such case, found in a trial con-ducted on the theory of defendant's unconditional liability for the entire damages sustained, should be set aside as hav-ing been rendered under a misapprehension of law, and fail-ure of the trial court to set it aside upon a motion for a new trial is reversible error.  (p. 237).

7.   EVIDENCE—*Identification of X-Ray Plates by Surgeon Directing Their Making and Using Them Held to Warrant Admission.*

Identification of X-ray plates by the surgeon under whose general direction and for whose use they were made and by whom they were used in his diagnosis of a wound, is suffi-

90 W. Va. ₒ

cient for their admission in evidence, although the pictures were not taken or developed in his presence. (p. 245).

Error to Circuit Court, Kanawha County.

Action by J. R. Jenkins against the Charleston General Hospital & Training School. Verdict and judgement for plaintiff, and defendant brings error

*Reversed and remanded.*

*Brown, Jackson & Knight,* for plaintiff in error.
*A. A. Lilly* and *M. F. Matheny,* for defendant in error.

POFFENBARGER, PRESIDENT:

The verdict and judgment complained of on this writ of error stand upon the hypothesis and finding of negligence on the part of the defendant, regarded as a purely private hospital conducted for profit, in the treatment of a patient, resulting in his permanent injury. The inquiry submitted goes principally to the correctness of the judgment and verdict, as determined by the law and the evidence, only slight complaint being made as to rulings on the admission of evidence, and none as to the giving or refusal of instructions.

Immunity from liability for negligence of its physicians in the treatment of the case, on the part of the defendant, is not claimed. The defenses are that the only physician who attended the patient was an independent contractor; that, if this defense fails, there was no negligence in the diagnosis or treatment; and that, if there was such negligence, recovery is barred by contributory negligence.

A hospital incorporated and conducted for private gain, or the benefit of the stockholders, is liable in damages to its patients, for negligence or misconduct of its officers and employees. *Hogan* v. *Hospital Co.,* 63 W. Va. 84; *Brown* v. *La Societe Francaise De Bienfaisance Mutuelle,* (Cal.) 71 Pac. Rep, 516; *Railroad Co.* v. *Woods,* 95 Tex, 223; 13 R. C. L. p. 949, sec. 13 title, "Hospitals." The purely private character of the defendant is practically admitted, no effort having been made to show that it was in any sense a charitable institution. The policy of the law forbids liability of a state or municipal hospital for negligence of its servants

* 90 W. Va.

and physicians, it being a governmental agency. In the absence of a statute expressly imposing it, the State is never liable for the negligence of its officers. Such liability would result in enormous public burdens. On similar grounds, the law exempts charitable institutions from liability for the negligence of its servants and agents. Such institutions administer trust funds, and it is not just that they should be dissipated with liabilities of that kind. In the case of a private hospital, the capital invested is neither public money nor a trust fund. It is like capital invested in any other corporation conducted for profit. Hence, there is no ground of public policy upon which it can be exempted from liability for negligence on the part of its servants or agents. In its contracts, it stands upon the same basis as any other contractor and, as to employees and third persons, it is subject to the general rule, *respondeat superior*.

Defendant and plaintiff were brought into relation with each other through the agency of the employer of the latter, The Western Pocahontas Fuel Co. At the time of his injury, that company was paying him a salary of $125.00 per month for his services in its engineering department, and, from his salary, he along with all other employees of the company, was contributing a small amount each month to a fund, in consideration of which the company contracted with the defendant, for its medical and surgical treatment of its employees.

His left arm having been broken by a piece of flying or falling rock, first aid was given him by a local physician, who put the arm in splints, and then, with his employer's certificate of admission to the hospital, he came to Charleston and was registered in that institution, but his stay within its walls was limited to a few hours. After registration and the making out of a chart, an X-ray specialist was called in, at the expense of the hospital, and a picture of the arm taken. This operation consumed but a few minutes. After it was over, the plaintiff and his father remained in the hospital but a short time, probably about two hours. Being advised that the picture would not be developed and ready for use until the next morning, the father and son went to a

hotel, with the understanding that they would be advised of the result, the next morning, before the running of a certain train, at about nine o'clock, by which they expected to depart for Beckley, in order to allow the son to register under the draft law, if the condition of his arm would permit his departure. On the next morning, before the time for their departure had arrived, the father called up the hospital and was advised that the plate was not yet ready, but that, if he desired to take his son to Beckley, he could do so and the result of the reading would be given him later. With that understanding, they left. They were at the hospital September the 11th and left the city the next day. On September 14, 1918, three days after the visit to the hospital, the father received a letter from the superintendent, dated, September 12, saying: ''X-ray of arm shows fracture of both the ulna and radius in upper third with very little displacement. New splints will not have to be applied.'' The superintendent says this was a copy of a letter sent to the physician by whom he thought the patient had been sent to the hospital. He further says that between twelve and two o'clock, September 11, while he was at work in his office, the plaintiff passed by and told him he was going to Beckley; and that, in response to that, he said ''why don't you stay and find out the reading of this X-ray picture and whether you need further treatment;'' and that he replied that he would rather be at home during the period of convalescence. The superintendent says he then insisted that he stay in the hospital, both for the reading of the picture and to take treatment. No denial of this demand or caution is found in the testimony.

Between the date of his return to Beckley and that of an examination of the arm by a local physician, the plaintiff had discussed his case with that physician and was advised not to have the splints taken off for a week or two, as it would be dangerous to remove them before union of the broken bones. In these conversations, the substance of the letter stating the nature of the injury was given the physician. About three weeks after the date of injury, this physician took off the bandages and discovered that the arm was crooked

and advised the plaintiff of his fear of some trouble. He also told him it would be a good thing for him to go right back to the hospital. Then he replaced the splints and told the plaintiff he thought they could be permanently removed in about two weeks. After the lapse of that time, they were removed and it was found that the arm was crooked and that there was still some swelling in the elbow. Thereupon, the physician advised him to go to a bone surgeon. He did so, December 30, 1918, and it was found, by X-ray investigation, that the radial head had been dislocated and never replaced, and that, for some reason not clearly explained, but evidently lack of union of one or both of the fractures, it was necessary to open the wound and cut away portions of the bones, in an effort to obtain union and a straighter arm. Later, a second operation was performed, in which a little of the radial head was cut off. The arm is still in bad condition. It is crooked and the break in the ulna has not united and likely never will. The radius does not touch the humerus, but stands out in the tissue. These two operations were performed by a surgeon in no way connected with the defendant, and in a different hospital.

For two very good reasons, the defense of injury by an independent contractor cannot be maintained. The radiologist was employed and paid by the defendant to perform work, in discharge of its own contract and undertaking to diagnose and treat the injury. Farming out work to be done under a contract never relieves from the obligation of the contract. A man cannot avoid his contract by devolving performance thereof upon a stranger. In the next place the taking of the X-ray picture, whether properly or negligently done, was only partial performance of the diagnosis, or rather one method of investigation and not necessarily conclusive. The picture had to be read and interpreted and judgment passed upon the conditions disclosed by it. From those conditions, it was necessary to say whether treatment was necessary, and that lies clearly beyond the province and employment of the radiologist.

At the date of the alleged negligence, the staff of the hospital had been disrupted and depleted by enlistments in the

military service of the country, in both the medical and sur-
gical departments. In this circumstance, there is no legal
justification for any dereliction of duty on the part of the
defendant; but it bears strongly upon the moral aspects of the
case, wherefore it is stated upon consideration of fairness
to an institution charged with negligence. Another circum-
stance is possible misapprehension of the intent and purpose
pose of the plaintiff in coming to the hospital. The super-
intendent swears he understood he had come for an X-ray
examination and not for treatment. Between this statement
and another to the effect that the plaintiff had been advised
to remain for treatment, if found necessary, there is a degree
of inconsistency, but necessity of treatment was not obvious,
and no doubt there was a presumption against it, since the
fracture had been reduced by a physician and the arm put
in splints which it would not have been good practice to re-
move, if the bones had been properly set. Then there was
manifest impatience on the part of the plaintiff and a fixed
determination to return to Beckley on the   next   day, if
possible.

The X-ray plate taken at the hospital was introduced in
evidence and clearly showed the fractures of both bones.
From it, the jury could have found that, for some reason, the
letter received, September 14th, did not correspond with its
disclosure as to displacement. The alignment of the ulna was
shown to be almost perfect, but that of the radius appeared
to be very imperfect. Little more than half of one broken
end, appears to have joined the other, and, at the fracture,
the end next to the elbow was plainly depressed. It was re-
vealed by the X-ray picture taken at Huntington, December
30, 1918, that the other end of that bone which should have
stood against the humerus, had been dislocated. This dis-
location seems not to have been discovered by the physician
who reduced the fracture, for there were no splints nor any
bandage on the elbow. The X-ray expert seems to have as-
sumed lack of injury at that point, because a physician had
presumptively examined it and found none. The picture
was taken of part or all of the bandaged portion of the arm.
As the end of the broken radius next to the elbow was de-

pressed at the fracture, as shown by the picture, a careful inspection of it might have suggested the additional injury and trouble afterward disclosed. The jury could also have inferred that the arm was crooked at the time of the taking of the picture and that investigation sufficient to disclose it was omitted. But one picture was taken at that time. To determine whether a bone is crooked or straight, the practice is to take pictures of it from two directions determined by lines at right angles with each other. Upon this imperfect and incomplete investigation, the patient was permitted to depart and afterwards advised that the alignment of the bones was fairly good and that the wound needed no further treatment at that time. No specialist in surgery, examined the arm and the superintendent's letter followed the terms of the X-ray report. The superintendent, practicing surgery with medicine, says he saw the X-ray plate, but not that he examined the arm. The testimony of the plaintiff and his father, narrating what occurred at the hospital, warrants the inference that nobody investigated the injury, by manipulation of the arm or otherwise than with the X-ray machine.

The negligence of the defendant, if any, did not consist of improper treatment of the wound, for none was administered. But a physician or surgeon is liable for negligence or carelessness resulting in failure of his diagnosis to disclose an injury or the extent thereof and consequential detriment to the patient. *Burk* v. *Foster,* 114 Ky. 20, 59 L. R. A. 277; *Granger* v. *Still,* 187 Mo. 197; *Mauser* v. *Collins,* 69 Kan. 290; *Lewis* v. *Dwinell,* 84 Me. 497; *Harriott* v. *Plimpton,* 166 Mass. 585. The same rule applies to private hospitals. There was an undiscovered injury and there was only a partial and very hurried investigation made. This may have been largely due to an assumption of lack of necessity for further examination, based upon the previous reduction of the fracture and the manner in which the arm was bandaged. Adoption of that theory, however, was failure to do the very thing demanded and contracted for by the patient. He had come to ascertain the nature and extent of the injury and to obtain further treatment, if deemed to be necessary or

advisable.' Of course, a physician or surgeon does not guarantee the correctness of his diagnosis or the success of his treatment, nor is he liable for mistakes, if he has exercised the required degree of care and diligence. But the fact that, in an investigation, he has failed to discover what a careful diagnosis would necessarily have disclosed is some evidence of lack of due care and diligence. In this case, there were distinct, but related injuries, fractures of two bones at one place and dislocation of one of the bones at another. One of them was neither discovered nor searched for. Upon the authorities above referred to, we are of the opinion that the evidence is sufficient to sustain a finding of negligence on the part of the defendant. The distinction between excusable errors and negligence is well stated in the following text from 30 Cyc., 1578: "A physician entitled to practice his profession, possessing the requisite qualifications, and applying his skill and judgment with due care, is not ordinarily liable for damages consequent upon an honest mistake or an error of judgment in making a diagnosis, in prescribing treatment, or in determining upon an operation, where there is reasonable doubt as to the nature of the physical conditions involved, or as to what should have been done in accordance with recognized authority and good current practice. Whether errors of judgment will or will not make a physician liable in a given case depends not merely upon the fact that he may be ordinarily skilful as such, but whether he has treated the case skilfully or has exercised in its treatment such reasonable skill and diligence as is ordinarily exercised in his profession. There is a fundamental difference in malpractice cases between mere error of judgment and negligence in previously collecting data essential to a proper conclusion, or in subsequent conduct in the selection and use of instrumentalities with which the physician may execute his judgment. If he omits to inform himself as to the facts and circumstances, and injury results therefrom, then he is liable."

That there was negligence on the part of the plaintiff, contributing to the unfortunate condition in which he finds himself is so apparent as to leave no room for two different

and intelligent opinions. Though informed by Dr. Jarrold that the crookedness of his arm betokened serious trouble and advised by him to return to the hospital, he did not do so. When, two weeks later, five weeks from the date of the injury, he was again advised of a dangerous condition and the necessity of special treatment, he still delayed action and did not seek it until late in December, 1918, a date more than three and a half months after the injury and the negligent diagnosis. It cannot be said, reasonably or consistently, that, in all this delay, he relied upon the letter indicating a satisfactory condition of the wound, for the contrary was emphatically asserted by his physician who considered his case professionally with full knowledge of the contents of the letter. No reasonably intelligent and prudent man would have relied upon it after that. As to these facts, there can be no doubt. They were proved as part of the plaintiff's case.

If, in law, this conduct constitutes contributory negligence, it manifestly bars right of recovery. If it does not, it goes merely in mitigation of the damages. In *Lawson* v. *Conaway*, 37 W. Va. 159, it is held that, to be contributory, negligence must be contemporaneous with the main fact charged as negligence, and that the patient's negligence after dismissal of the physician, or his abandonment of the case, does not bar recovery for the negligence of the latter, committed before termination of the relation. This holding is obviously not decisive of the status of the patient's negligence before termination of the relation. Subsequent negligence, under such circumstances, could not well be held to have been contributory, for the negligence of the physician, violation of the duty imposed by his contract, necessarily ends with the termination of the contract. *Mucci* v. *Houghton*, 89 Ia. 608; *Ballou* v. *Prescott*, 64 Me. 305; *Dashiell* v. *Griffith*, 84 Md. 365; *Becker* v. *Janinski*, 27 Abb. N. C. 45; *Kendall* v. *Brown*, 74 Ill. 32. He is then under a liability, but not under any duty to the patient. In such case, the subsequent negligence could be no more than a mitigating fact or circumstance. The ruling above referred to was called forth by an exception to the giving of an instruction

telling the jury, unqualifiedly, that the negligence of the patient, if any, barred recovery. One of the main issues in the case was whether the relation had been terminated. In disapproving the instruction, the court said it should have been framed so as to adapt it to the evidence. In doing so, it impliedly held that if the plaintiff's negligence occurred and contributed before termination of the relation, it would defeat recovery.

In *West* v. *Martin,* 31 Mo. 375, an instruction assuming non-liability on the theory of contributory negligence was disapproved on the ground of lack of evidence of any possible connection between the patient's dereliction of duty and the injury. The defendant had negligently failed properly to set a broken bone. That was an affirmative act in which the patient could have had no part, constiuting a complete and actionable injury. There are like holdings upon similar facts in other jurisdictions. *Carpenter* v. *Black,* 75 N. Y. 12; *Dubois* v. *Decker,* 130 N. Y. 325; *McCracken* v. *Smathers,* 12 N. C. 799. An instructive case in which the distinction between contributing and subsequent or independent negligence, on the part of the plaintiff, is observed, is *Wilmot* v. *Howard,* 39 Vt. 447. In that case, the trial court had refused an instruction which would have told the jury the plaintiff could not recover, if his failure to get a sound arm resulted in part from mismanagement or negligence of those having charge of him. It did charge the jury that he could not recover, if his negligence contributed to the defective result. The appellate court approved the ruling on the ground that the instruction was broad enough to permit defeat of the action, by proof of independent or supervening negligence. The court's conclusion is best expressed in its own language. Speaking of the cases relied upon by the defendant, the judge delivering the opinion said: "In those cases the alleged negligence on the part of the plaintiff was simultaneous and co-operating with the alleged fault of the defendant, an element in the very transaction which constitutes the alleged cause of action. The contributory negligence on the part of the plaintiff, in all the cases, that has been held to preclude his right of recovery, has entered

into *the creation of the cause of action,* and not merely supervened upon it, by way of aggravating the damaging results." The distinction was well expressed, also, in *Hibbard* v. *Thompson,* 109 Mass. 286, in the following terms: "If it be impossible to separate the injury occasioned by the neglect of the plaintiff from that occasioned by the neglect of the defendant, the plaintiff cannot recover. If, however, they can be separated, for such injury as the plaintiff may show thus proceeded solely from the want of ordinary skill or ordinary care of the defendant, he may recover." The separation must take place, of course, as indicated, in, respect of causal relation to injuries, not mere apportionment of the damages resulting from a single injury caused by the combined negligence of both parties. An illustration of independent injuries involved in a case is found in *Gates* v. *Fleischer,* 67 Wis. 504. Evidence adduced tended to prove injury by malpractice in the treatment of one affliction and injury occasioned by another pre-existing disease from which the patient suffered and for which she was not treated. No abatement from the damages recoverable for malpractice was allowed on account of those occasioned by the untreated disease. The surgical case was an obstetrical one complicated by the pre-existing disease. Hence, there seems to have been both negligence in diagnosis and improper and injurious treatment, but the court did not so regard it.

In its circumstances, this case is clearly distinguishable from those above analyzed, in all of which there was affirmative action on the part of the physician, inflicting immediate injury. The negligence consisted of an act of commission, not omission. Here we have the exact opposite. There was no contribution by the plaintiff to the negligent diagnosis. If, by that alone, the injury was occasioned, the plaintiff's subsequent dereliction of duty did not contribute to it. That, however, cannot be deemed to have been the proximate cause of the injury. It was a mere premise or inducement to the failure to treat the arm, which actually inflicted the injury. That dereliction, failure to treat, was not completed by the reading of the X-ray plate and writing of the reassuring letter. It continued to operate as long as the relation of physi-

cian and patient continued. If, notwithstanding the negligent diagnosis, proper treatment had been given in ignorance of the full nature or extent of the injury, the plaintiff would have had no cause of action. *Tomer* v. *Aiken,* 126 Ia. 114. That the failure to treat, induced by ignorance of the trouble, due to negligence, is the proximate cause of the injury to the patient by the physician, is made clear by the reasoning of Price, J., in *Gillette* v. *Tucker,* 67 O. St. 106, ably and extensively annotated in 93 A. S. R. 657, and authorities cited by him. In that case, the decision of the trial court was affirmed by an equal division in the appellate court, but the division took place on the question of the application of the statute of limitations. Besides, the injurious act of the physician was affirmative in character and was completed in a few minutes. After an abdominal operation, he, by oversight, left a sponge in the abdomen of the patient, in closing the wound. The judges favoring affirmance of the judgment took the position that the relation of physician and patient did not terminate with the completion of the surgical operation, that the surgeon remained under duty to treat the patient and to discover and remedy the trouble caused by his oversight and that, therefore, the statute of limitations did not begin to run with the date of the operation. There was a continuing duty and conformably, a continuous cause of injury to the patient in the non-performance thereof. In the opinion in which they concurred, it is said: "We hold the proposition to be sound that this degree of skill and care is to be exercised, not only in performing the operation, but also in the subsequent necessary treatment following the operation, unless the terms of employment otherwise limit the service, or the surgeon give the patient notice that he will not or cannot afford the subsequent treatment." This was expressly held in a case involving the conduct of a veterinary surgeon, after an operation performed by him upon an animal. *Williams* v. *Gilman,* 71 Me. 21. That failure to treat is the proximate cause was assumed in *Manser* v. *Collins,* 69 Kan. 290, a case of failure to treat due to non-disovercy of the nature of an injury, the court saying: "It may be said that the failure of the doctor to alleviate the patient's suffering was the cause

of it, at least, to the excess above a minimum to which it might have been reduced after prompt discovery of the cause and by proper treatment.''

In principle, the present inquiry is exactly like the one involved in the ascertainment of the date from which the statute of limitations begins to run. It runs from the accrual of the cause of action, and not until such cause becomes complete. In contracts of employment or agency, in which no time is fixed for payment or for termination of the contract, the statute does not begin to run until the services are ended. Wood, St. Lim., 4th Ed., sec. 119c (2). Many continuing contracts fall within the same rule. *Id.* sec. 119c. (1). So do professional service contracts. *Id.* sec. 119c. (3). In the law of torts including negligence, continuous or successive causes of action arising from the same wrongful act, are recognized, in the application of the law of remedies and the statute of limitations. *Godbey* v. *Bluefield,* 61 W. Va. 604; *Henry* v. *Railroad Co.,* 40 W. Va. 234; *Field* v. *Brown,* 24 Gratt. 74; *Staple* v. *Spring,* 10 Mass. 72; *Bonomi* v. *Backhouse,* 9 H. L. Cas. 503; *Colliery Co.* v. *Mitchell,* 11 N. C. 127; *Lewey* v. *H. C. Frick Coal Co.,* 166 Pa. St. 536; Wood St. Lim., sec. 178.

Assuming the contract between the plaintiff and defendant to have been one for treatment, the latter was under continuous duty and in daily default working daily injury to the former; and when the patient, by his negligence, within the period of the defendant's duty and default, failed to return for treatment and to obtain it elsewhere, he necessarily contributed to the injury suffered by the defendant's negligence. *Richards* v. *Willard,* 176 Pa. St. 181. If he did not enter the hospital for treatment, but only for an examination, the defendant's liability is no doubt limited to such damages as accrued between the date of the examination and that of the discovery of trouble which the plaintiff himself should have had corrected. As to this, however, we decide nothing, since the jury obviously found that the contract was for treatment and such finding is sustained by evidence. Manifestly the plaintiff was guilty of contributory negligence, as matter of law, but not until after the negligence of the de-

fendant had inflicted some injury upon him. The original negligence, committed within the period of employment continuing until the plaintiff's negligence occurred, was the detriment. suffered between the dates of the two acts of negli-. gence. In other words, the proximate cause of the injury complained of was non-treatment. In the first instance, non-treatment was imputable to the defendant alone, and, later, to both it and the defendant. For this conclusion, direct authority is found in *Mauser* v. *Collins*, 60 Kan. 290, holding the defendant liable for the pain and suffering of the plain-. tiff between the date on which the latter should have been treated and the date on which she contributed by her failure to obtain it, after having been advised of her real condition and the necessity therefor. That holding conforms to the principle enunciated in *Hibbard* v. *Thompson*, 109 Mass. 286; *Wilmot* v. *Howard*, 39 Vt. 447, already referred to.

No effort was made in the course of the trial to apply the legal principle requiring apportionment or limitation of damages in conformity with the bases of liability, as here defined. In attempting to prove his case, the plaintiff imputed all of the injury and damages to the defendant, notwithstanding the obvious lack of right to recover for so much of the damages as were occasioned by the combined negligence of both, if apportionment thereof by the jury was possible. Nor was the attention of the jury directed to their power and duty to make the apportionment, if practicable, and limit their verdict to the damages accrued before the date of the plaintiff's contribution to the negligence of the defendant. If a proper inquiry had been made, it might have been shown that the effect of the defendant's negligence was slight and of little consequence, and that substantially all of the injury complained of was the result of the concurrent negligence. Presumptively therefore, the verdict is based upon an erroneous theory. The jury no doubt took the case as it was submitted to them by the court and the attorneys representing the parties and charged the defendant with the entire damages. Misapprehension of the law by the jury alone, when apparent, is good ground for a new trial. When the court, parties and jury all fall victims to it, the case is infinitely stronger. The

issue was submitted upon an erroneous theory and the verdict is manifestly contrary to the law and the evidence, wherefore the motion to set it aside should have been sustained.

The evidence admitted over objections of the defendant, consisted of X-ray plates, taken under the general direction of the surgeon who performed the two operations mentioned, but not in his presence. As they were taken for him and by his direction, and used and identified by him, they were properly admitted.

For the errors noted, the judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and remanded.*