560 S.E.2d 491

**Brian W. ROWE, Plaintiff Below, Appellee,**

v.

**SISTERS OF THE PALLOTTINE MISSIONARY SOCIETY, a non-profit corporation, Defendant Below, Appellant.**

No. 29161.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 19, 2001.

Decided Dec. 11, 2001.

Concurring and Dissenting Opinion of Justice Davis Dec. 12, 2001.

Concurring Opinion of Chief Justice McGraw Dec. 18, 2001.

William D. Levine, Esq., St. Clair & Levine, Huntington, for the Appellee.

Joseph M. Farrell, Jr., Esq., Robert L. Hogan, Esq., Farrell, Farrell & Farrell, L.C., Huntington, for the Appellant.

STARCHER, Justice.

In this medical malpractice action from the Circuit Court of Cabell County, we are asked to examine a judgment order adopting a jury's verdict awarding damages to appellee, Brian W. Rowe ("Mr. Rowe"). The appellant is the Sisters of Pallottine Missionary Society, which does business as St. Mary's Hospital. The appellant hospital contends that the circuit court erred in refusing to instruct the jury on the principles of comparative negligence.

As set forth below, we find the circuit court correctly refused to give comparative negligence instructions to the jury. We therefore affirm the circuit court's judgment order.

### I.

*Facts & Background*

On the afternoon of Sunday, September 6, 1987, 17-year-old appellee Brian W. Rowe lost control of his motorcycle while participating in a motocross event. During the crash, the motorcycle tumbled onto Mr. Rowe's left leg, injuring his knee. Mr. Rowe was transported by ambulance to the emergency room of the appellant, St. Mary's Hospital.

Mr. Rowe arrived at St. Mary's Hospital at approximately 4:05 p.m., where his left leg was examined by emergency room nurses. Over the course of the next 2½ hours, the nurses made extensive notes in Mr. Rowe's patient file. The notes indicate that Mr. Rowe complained of severe pain in his left knee and numbness in his foot. The nurses were repeatedly unable to find a pulse in Mr. Rowe's lower left leg and foot either by palpitation or with the assistance of a portable Doppler ultrasound device.

Mr. Rowe was also examined by a St. Mary's Hospital emergency room physician,

Dr. Willard F. Daniels,[1] a defendant below. Dr. Daniels noted tenderness and swelling in the left knee and lower left leg, and he had difficulty finding—but claimed he did find—a pulse in Mr. Rowe's lower leg and foot. A nurse testified that she told Dr. Daniels that she was unable to detect a pulse in Mr. Rowe's foot, that she asked Dr. Daniels why she wasn't getting a pulse, and that Dr. Daniels replied, "I don't know[.]" While x-rays showed fragments of bone in Mr. Rowe's knee joint, Dr. Daniels noted in the patient file that Mr. Rowe had a "severe sprain, [left] knee."

Mr. Rowe was discharged at 6:20 p.m. to be taken home by his mother. He was given instructions to elevate his left leg and apply ice to the knee. Mr. Rowe was also told that the nurses could not find a pulse in his lower leg, but that this condition was probably caused by the swelling, and that a pulse would return when the swelling went down. Mr. Rowe was instructed to make an appointment with an orthopedist several days later, and was told that in the meanwhile, if his pain continued or became worse, he should return to St. Mary's emergency room.

That night, Mr. Rowe's knee and leg continued to swell, and the pain intensified. His parents called several physicians by phone, and one agreed to see Mr. Rowe at 10:00 a.m. the next morning at Cabell Huntington Hospital's emergency room.

An examination revealed that Mr. Rowe had a dislocated knee and a lacerated popliteal artery, an artery which passes behind the knee joint and provides circulation to the lower leg. Because of the loss of blood flow, the physician contemplated amputation of the lower left leg. However, after extensive surgery to repair the knee and artery, to relieve pressure on the leg and to remove dead tissue, the lower leg was saved. Mr. Rowe was hospitalized for 35 days, and currently has significant impairment to the use of his left leg.

The appellee, Mr. Rowe, subsequently brought a lawsuit against Dr. Daniels and against appellant St. Mary's Hospital for negligence. In October 1996, after 8 years of litigation, the appellee settled his cause of action against Dr. Daniels for $270,000.00, and the case proceeded to trial against the hospital alone.

At trial, the appellee asserted that St. Mary's nurses had breached the standard of care by not adequately advocating his interests when he was discharged with unexplained and unaddressed symptoms. The appellee presented evidence that St. Mary's policy—and the guiding standard of care for all emergency room nurses—was that when a nurse "believe[d] that appropriate care [was] not being administered to a patient by a physician," the nurse was to report the situation to a supervisor who would discuss it with the doctor. If that did not alleviate the problem, the matter was to be referred up the chain of command so that another doctor could evaluate the problem.[2]

The appellee argued that St. Mary's nurses repeatedly found no pulse in his lower left leg or foot, and that when Dr. Daniels did not

---

**1.** As will be discussed later, Dr. Daniels settled with Mr. Rowe prior to trial.

**2.** The parties presented the following stipulation, in part, to the jury:

[S]hould there be an occasion when an RN believes that appropriate care is not being administered to a patient by a physician, the following procedure shall occur:

One, the RN will discuss her concerns with the physician. If, after the discussion, she still feels that the care is inappropriate, she will report it to the clinical manager, if available, or the patient care coordinator on duty.

Secondly, the clinical manager or patient care coordinator will weigh the factors involved and if she feels that the concern is valid, she will discuss it with the physician. If noth-

ing is done to ease her concern, she will contact nursing administration.

Thirdly, nursing administration will discuss it with the clinical manager and contact the chief of service for guidance and assistance. If nursing administration, after discussion with the chief of services, feels that appropriate action still has not been taken, the problem will then be referred to the assistant executive director of medical affairs.

The director of medical affairs will contact the attending physician and/or chief of service. Should appropriate action not be taken at this level, the director of medical affairs will contact the president of the medical staff.

Nursing administration may at any point in time request the assistance from administration.

address this serious symptom, the nurses did not properly report the problem to a supervisor, or otherwise seek another medical opinion. As the plaintiff's expert stated:

> [T]he nurses at St. Mary's Hospital failed to advocate for Brian Rowe in the sense that they knew that he had compromised circulation to his left leg. He had no pulse. He was not able to move his foot. He had no sensation in his foot.... [T]he nurses did not intervene with the physician and try to influence his care so that he would have gotten further medical care to address those serious problems.

The evidence showed that, instead of following the hospital's policy, the emergency room nurses simply made notes of their findings in Mr. Rowe's medical file, as one nurse said, "I guess basically to cover myself."

A jury returned a verdict against the appellee hospital for $880,186.00. A judgment order adopting the jury's verdict, with an offset for Dr. Daniels' settlement, was entered on September 13, 1999. The hospital now appeals the circuit court's judgment order.

## II.

### Standard of Review

■ In the instant case, we are asked to review the circuit court's refusal to give certain instructions to the jury. We held, at Syllabus Point 1 of State v. Hinkle, 200 W.Va. 280, 489 S.E.2d 257 (1996), that:

> As a general rule, the refusal to give a requested jury instruction is reviewed for an abuse of discretion. By contrast, the question of whether a jury was properly instructed is a question of law, and the review is de novo.

## III.

### Discussion

The appellant, St. Mary's Hospital, argues that the jury should have been instructed on principles of comparative negligence, and been required to assess the contributory negligence of the appellee, Mr. Rowe; the negligence of Dr. Daniels, who settled prior to trial; and the negligence of other individuals, namely the physicians who consulted on the appellee's case by telephone with the appellee's parents, but who would not see the appellee the night of his accident.

■ Under the comparative negligence doctrine, a plaintiff is not entitled to recover from a negligent tortfeasor if the plaintiff's own contributory negligence equals or exceeds the combined negligence or fault of the other parties involved in the accident or occurrence. As we stated in Syllabus Point 3 of Bradley v. Appalachian Power Co., 163 W.Va. 332, 256 S.E.2d 879 (1979):

> A party is not barred from recovering damages in a tort action so long as his negligence or fault does not equal or exceed the combined negligence or fault of the other parties involved in the accident.

In operation, the jury must apportion the comparative fault of parties in special interrogatories. 163 W.Va. at 343, 256 S.E.2d at 885–86. The plaintiff's percentage of fault is then deducted from the gross award of the jury, 163 W.Va. at 343, 256 S.E.2d at 886, and the defendants may seek contribution from other defendants in accordance with their percentage of fault.

The appellant contends that the jury should have been instructed to consider the contributory negligence of the appellee, and apportion comparative fault between the appellee and the appellant hospital. The appellant argues that the appellee's own conduct in crashing his motorcycle caused many of his injuries. Furthermore, when the appellee was discharged at 6:20 p.m., he and his mother were told that if his condition persisted or became worse, he should be brought back to St. Mary's emergency department. When his condition did not improve later that night, and the appellee's parents did not return him to the emergency room, the appellant argues the appellee was negligent and contributed to his injury.

■ We begin by addressing the appellant's first argument, that the appellee's own conduct in crashing his motorcycle contributed to his injury, and that the jury should have been instructed to consider whether this conduct was a proximate cause of the appellee's damages. We find nothing in the

**22**

record to suggest that the appellee's crash was caused by negligence, but for purposes of this argument, we will assume the appellee's conduct was negligent.

A majority of courts hold that a health care provider cannot compare the plaintiff's negligent conduct that triggered the plaintiff's need for treatment with the health care provider's later negligence in treating the plaintiff. *See* M. Orr, "Defense of Patient's Contribution to Fault in Medical Malpractice Actions," 25 Creighton L.Rev. 665, 687 (1992). The reason for this rule is simple and obvious:

> ·[A] physician simply may not avoid liability for negligent treatment by asserting that the patient's injuries were originally caused by the patient's own negligence. "Those patients who may have negligently injured themselves are nevertheless entitled to subsequent non-negligent medical treatment and to an undiminished recovery if such subsequent non-negligent treatment is not afforded."

*Fritts v. McKinne,* 934 P.2d 371, 374 (Okla. Civ.App.Div.1996) (reversing and remanding for a new trial because jury was instructed to consider plaintiff's drunk driving, which caused the accident for which he was subsequently negligently treated, as evidence of the patient's comparative negligence in the malpractice action), *quoting Martin v. Reed,* 200 Ga.App. 775, 777, 409 S.E.2d 874, 876–77 (1991) (holding that a jury is not authorized to find that even though subsequent treatment and diagnosis did constitute malpractice, a recovery therefor is barred because the original car accident was caused by plaintiff). *See also, Huffman v. Thomas,* 26 Kan. App.2d 685, 994 P.2d 1072 (1999) (physician could not introduce evidence that decedent negligently placed truck on lift as defense to negligent treatment); *Harvey ex rel. Harvey v. Mid–Coast Hospital,* 36 F.Supp.2d 32 (D.Me.1999) (principles of comparative fault do not apply in a medical malpractice action where plaintiff attempted suicide and hospital subsequently negligently administered treatment).

■ We therefore hold that in a medical malpractice claim, a health care provider is not entitled to a comparative negligence instruction requiring a jury to consider the plaintiff's negligent conduct that triggered the plaintiff's need for medical treatment. Plaintiffs who negligently injure themselves are entitled to subsequent, non-negligent medical treatment. If a health care provider renders negligent medical treatment, regardless of the event that triggered the need for medical treatment, plaintiffs are entitled to an undiminished recovery in a tort action for any damages proximately caused by that negligent medical treatment. The circuit court did not abuse its discretion in refusing to give an instruction on this issue.

■ Next, we examine the appellant's argument that it was entitled to an instruction requiring the jury to consider whether the plaintiff was contributorily negligent in not returning to the St. Mary's emergency room.

In the context of medical malpractice actions, courts usually place extreme limits upon a health care provider's use of the defense of comparative negligence. Courts do this because of the "disparity in medical knowledge between the patient and the physician," and because of the "patient's justifiable reliance on the [physician's] recommendations and care." M. Orr, "Defense of Patient's Contribution to Fault in Medical Malpractice Actions," 25 Creighton L.Rev. 665, 677 (1992). *See also, Judy v. Grant Co. Health Dept.,* 210 W.Va. 286, 291, 557 S.E.2d 340, 345 (2001) (*per curiam*) ("'The physician-patient relationship differs substantially from that of the ordinary plaintiff and defendant' . . . . This is so because of the great disparity in medical knowledge between 'doctor and patient.'"). We recognized over a century ago that the doctrine of contributory negligence has a limited use in the medical negligence field when we stated:

> It is the duty of the patient to co-operate with the physician, and to conform to his prescriptions and directions, and if he neglect to do so, he can not hold the physician responsible for his own neglect. On the other hand, he has a right to rely upon the instructions and directions of his physician and incurs no liability by so doing.

Syllabus Point 3, in part, *Lawson v. Conaway*, 37 W.Va. 159, 16 S.E. 564 (1892). *See also Jenkins v. Charleston General Hospital & Training School,* 90 W.Va. 230, 110 S.E. 560 (1922).

 In any action—medical malpractice or otherwise—the defendant carries the initial burden of proving an affirmative defense such as comparative negligence. As we stated in Syllabus Point 6 of *Leftwich v. Wesco Corp.,* 146 W.Va. 196, 119 S.E.2d 401 (1961) (*overruled on other grounds by Bradley v. Appalachian Power Co., supra*):

> Contributory negligence on the part of the plaintiff is an affirmative defense. There is a presumption of ordinary care in favor of the plaintiff, and where the defendant relies upon contributory negligence, the burden of proof rests upon the defendant to show such negligence unless it is disclosed by the plaintiff's evidence or may be fairly inferred by all of the evidence and circumstances surrounding the case.

To establish the defense of comparative negligence in a medical malpractice claim, the defendant must establish that the plaintiff has committed each of the elements of negligence:

> In order to establish the defense of comparative negligence [the defendant] had to prove each of the elements of negligence: that [the plaintiff] owed herself a duty of care, that she breached that duty and that the breach was the proximate cause of the damages she sustained. Proximate cause means that the alleged wrong of the party caused the damage. There must be such a natural, direct and continuous sequence between the negligent act and the injury that it can reasonably be said that but for the act, the injury would not have occurred.

*Borenstein v. Raskin,* 401 So.2d 884, 886 (Fla.App.1981). *See also, Riegel v. Beilan,* 788 So.2d 990, 991 (Fla.App.2000) ("To establish the defense of comparative negligence, the medical defendants had to prove each of the following elements of negligence: (1) The patient . . . owed himself a duty of care; (2) the patient breached that duty; and (3) the breach was the proximate cause of the damages the patient sustained."). We similarly stated in *Bradley* that "before any party is entitled to recover, it must be shown that the negligence of the defendant was the proximate cause of the accident and subsequent injuries. The same is true of contributory fault or negligence. Before it can be counted against a plaintiff, it must be found to be the proximate cause of his injuries." *Bradley,* 163 W.Va. at 342–343, 256 S.E.2d at 885.

 We therefore hold that for a health care provider to establish the defense of comparative negligence, the health care provider must prove, with respect to plaintiff's conduct after medical treatment is initiated, that: (1) the plaintiff owed himself a duty of care; (2) the plaintiff breached that duty; and (3) the breach was a proximate cause of the damages the plaintiff sustained.

Examining the record in the instant case, we find no evidence in the record indicating that Mr. Rowe breached any duty of care he may have owed himself. It appears that Mr. Rowe and his family were told he had no pulse in his lower left leg and foot, but they were also told that the pulse would return when the swelling went down. Dr. Daniels' erroneous diagnosis was a sprain to the left knee. Mr. Rowe was advised to keep ice on the knee and elevate his leg. He was advised to return to the appellant's emergency room if his condition worsened, without being given any timetable for making that evaluation. He was advised to see an orthopedic specialist later in the week. Had Mr. Rowe's parents not called other physicians, and arranged for Mr. Rowe to be promptly seen the following morning, it is possible that he might have lost his leg.

We stated in 1892, in *Lawson v. Conaway, supra,* that a patient "has a right to rely upon the instructions and directions of his physician and incurs no liability by so doing." Mr. Rowe appears to have followed the instructions of his physician, and returned to an emergency room the next day. We cannot, on this record, find that Mr. Rowe breached any duty of care.

 Additionally, we note that when contributory negligence by the patient arises as an issue in a medical malpractice context, there is often a need for the defendant to

offer expert testimony on the issue; usually only experts can testify regarding the proximate effect that a patient's negligence may have had to aggravate the patient's medical condition. *Lambert v. Shearer*, 84 Ohio App.3d 266, 285, 616 N.E.2d 965, 977 (1992); *Barton v. Owen*, 71 Cal.App.3d 484, 506, 139 Cal.Rptr. 494, 506 (1977). "In much the same way that laymen [on the jury] are not qualified to judge whether·a doctor has been negligent because of their lack of common knowledge on the subject, they also are not qualified from a medical standpoint to determine the effects of the 'negligent' acts of the plaintiff." *Barton*, 71 Cal.App.3d at 506, 139 Cal.Rptr. at 506.

We find no affirmative evidence in the record, and the appellant directs us to none, indicating that Mr. Rowe was negligent in the time he took to go to another emergency room, nor do we find any evidence that the passage of this time was a proximate cause of any portion of his damages. We therefore conclude that the circuit court did not abuse its discretion, and correctly refused to instruct the jury to consider whether Mr. Rowe was contributorily negligent.

■ The appellant hospital also contends that the jury should have been instructed to consider the negligence of Dr. Daniels, and

to consider the negligence of the other doctors telephoned by Mr. Rowe's parents the night of his injury.[3] The appellant argues that the circuit court erred by refusing to instruct the jury that it could apportion comparative negligence between these non-party tortfeasors and the appellant hospital.

■ In *Bowman v. Barnes*, 168 W.Va. 111, 282 S.E.2d 613 (1981), we held at Syllabus Point 3 that:

In order to obtain a proper assessment of the total amount of the plaintiff's contributory negligence under our comparative negligence rule, it must be ascertained in relation to all of the parties whose negligence contributed to the accident, and not merely those defendants involved in the litigation.

As *Bowman v. Barnes* makes clear, the comparative negligence doctrine applies only when a plaintiff has been contributorily negligent—the negligence of the plaintiff in causing his or her injury is ascertained in relation to all other tortfeasors.[4]

■ Consequently, without some proof of negligence by the plaintiff, there is no requirement that the jury be instructed to · ascertain or apportion fault between the defendant and a non-party tortfeasor.[5] *See*

---

3. The appellant contends that these other doctors, by refusing to see Mr. Rowe that night, essentially "abandoned" the appellee and thereby proximately caused his injuries. *See McAllister v. Weirton Hospital Co.*, 173 W.Va. 75, 312 S.E.2d 738 (1983); *Howell v. Biggart*, 108 W.Va. 560, 152 S.E. 323 (1930); *Young v. Jordan*, 106 W.Va. 139, 145 S.E. 41 (1928).

4. In those instances where a defendant intends to shift some degree of fault to a non-party tortfeasor, one court proposed the following rule in a medical malpractice action:

To prove the nonparties' negligence, Defendant had to show (1) the nonparties owed the patient a duty recognized by law, (2) the nonparties breached the duty by departing from the · proper standard of medical practice recognized in the community, and (3) the acts or omissions complained of proximately caused the patient's death.

*Jaramillo v. Kellogg*, 126 N.M. 84, 86, 966 P.2d 792, 794 (1998).

5. Between tortfeasors who have asserted claims for contribution, however, an instruction allowing a jury to apportion fault may be necessary so as to allow the tortfeasors to ascertain their de-

grees of joint and several liability. The concept of joint and several liability is a doctrine separate from the comparative negligence doctrine. As we held in Syllabus Point 2 of *Sitzes v. Anchor Motor Freight, Inc.*, 169 W.Va. 698, 289 S.E.2d 679 (1982), joint and several liability among joint tortfeasors was not changed by the adoption of the comparative negligence doctrine. When contribution claims have been asserted between joint tortfeasors, the relative fault of the various tortfeasors is relevant, and a jury could be properly instructed to assess the fault of the joint tortfeasors.

Additionally, when a tortfeasor seeks contribution or otherwise seeks to share liability with other tortfeasors, we have said:

"West Virginia jurisprudence favors the consideration, in a unitary trial, of all claims regarding liability and damages arising out of the same transaction, occurrence or nucleus of operative facts, and the joinder in such trial of all parties who may be responsible for the relief that is sought in the litigation."

Syllabus Point 4, *Sheetz, Inc. v. Bowles Rice McDavid Graff & Love, PLLC*, 209 W.Va. 318, 547 S.E.2d 256 (2001).

In the instant action, appellant St. Mary's Hospital is the sole party tortfeasor. It does not

*Travelers Ins. Co. v. Ballinger*, 312 So.2d 249, 251 (Fla.App.1975). More importantly, even if the plaintiff is guilty of some contributory negligence, in the absence of substantial evidence, an attorney cannot make an "empty chair" argument and blame an absent tortfeasor for a plaintiff's injury. As we recently stated in Syllabus Point 2 of *Doe v. Wal–Mart Stores, Inc.*, 210 W.Va. 664, 558 S.E.2d 663 (2001):

> It is improper for counsel to make arguments to the jury regarding a party's omission from a lawsuit or suggesting that the absent party is solely responsible for the plaintiff's injury where the evidence establishing the absent party's liability has not been fully developed.

In the instant action, the only parties are the plaintiff-appellee, Mr. Rowe, and the defendant-appellant, St. Mary's Hospital—and as we indicated above, the appellant failed to establish a cognizable issue at trial as to whether the appellee was in any way contributorily negligent. Accordingly, the only issue at trial was whether the appellant was negligent, and whether the appellant's negligence proximately caused the appellee's damages. Without more, the alleged negligence of other non-party tortfeasors would appear to be irrelevant, and argument or instructions regarding the liability of the non-party tortfeasors improper.

▮▮▮▮ The appellant, however, asserts that it was still entitled to an instruction allowing the jury to apportion fault between itself and the other, alleged non-party tortfeasors. The appellant directs our attention to a portion of the Medical Professional Liability Act, *W.Va.Code*, 55–7B–9(b) [1986], which states:

> In every medical professional liability action, the court shall make findings as to the total dollar amount awarded as damages to each plaintiff. The court shall enter judgment of joint and several liability against every defendant which bears twenty-five percent or more of the negligence attributable to all defendants. The court shall enter judgment of several, but not joint, liability against and among all defendants which bear less than twenty-

appear from the record that any cross- or coun-

five percent of the negligence attributable to all defendants.

The statute provides that, if a defendant in a medical professional liability action is less than 25% at fault for a plaintiff's damages, then the defendant is liable only for that percentage share of the plaintiff's damages. The appellant contends that, had the jury been instructed to consider the fault of Dr. Daniels and the other doctors called by the appellee's parents, it might have returned a verdict showing the appellant was less than 25% at fault—and therefore, St. Mary's would not be required to pay most of the outstanding balance of the judgment order. However, a plain reading of the statute leads us to reject the appellant's argument.

▮▮▮▮ "[G]enerally the words of a statute are to be given their ordinary and familiar significance and meaning[.]" *Amick v. C & T Development Co., Inc.*, 187 W.Va. 115, 118, 416 S.E.2d 73, 76 (1992). "It is not for this Court arbitrarily to read into [a statute] that which it does not say. Just as courts are not to eliminate through judicial interpretation words that were purposely included, we are obliged not to add to statutes something the Legislature purposely omitted." *Banker v. Banker*, 196 W.Va. 535, 546–47, 474 S.E.2d 465, 476–77 (1996).

*W.Va.Code*, 55–7B–9, by its own terms, applies only to the parties to a medical professional liability action, and does not apply to non-party tortfeasors. The first paragraph of the section makes clear that the section applies only "[i]n the trial of a medical professional liability action against a health care provider involving multiple defendants[.]" *W.Va.Code*, 55–7B–9(a). The Legislature specifically chose the terms "plaintiff" and "defendant" in discussing joint and several liability in *W.Va.Code*, 55–7B–9(b)— we decline to read these terms to mean "potential defendants" or other non-parties to the action, as the appellant urges.

▮▮▮ Dr. Daniels had settled and was dismissed from the action, and none of the other alleged tortfeasors was brought into the litigation, by either the appellee or the appellant. Dr. Daniels and the other alleged tort-

ter-claims for contribution have been asserted.

feasors were not "defendants" in the trial. We therefore conclude that the circuit court did not err in refusing to charge the jury to assess the comparative negligence of Dr. Daniels or any other non-party.[6]

## IV.

### Conclusion

. Finding no error in the circuit court's rulings, we affirm the September 13, 1999 judgment order for the appellee.

Affirmed.

DAVIS, J., concurring, in part, and dissenting, in part.

### (Filed Dec. 12, 2001)

The majority opinion addressed the Hospital's assignment of error involving the refusal of the trial court to give a comparative negligence instruction. I fully concur with the majority's resolution of that issue. However, the Hospital also assigned as error the closing argument statements made by plaintiff's counsel. The majority opinion has not addressed that assignment of error on its merits. It is from this part of the opinion that I dissent. I believe the Hospital was entitled to a new trial based upon improper remarks made by the plaintiff's counsel during closing argument.

### A. The Million Dollar Racehorse Argument Was Prejudicial

During the first half of plaintiff's closing argument, the following remarks were made to the jury by plaintiff's counsel:

And like I said, the value of loss of enjoyment of life is something that we don't value. People don't have any way. You can't go to the store. But I know one thing, if Brian Rowe was horse, I could

come in here and say, well, that horse's leg's worth——a Kentucky Derby winner, millions and millions of dollars. You wouldn't have any problem. This young man is certainly worth as much as a horse.

The hospital contends that it properly objected, and that the statement was reversible error.

**1. The issue was preserved for appellate review.** The majority opinion contends that a proper objection to the above statement was not presented. However, the record reflects differently. Immediately after plaintiff's counsel concluded the first half of closing argument, defense counsel approached the bench and motioned for a mistrial. For reasons not apparent in the record, the initial discussion of this matter was off the record. However, once the jury retired to deliberate, the issue was placed on the record as follows.

Judge: ... Mr. Farrell, you made an objection at the conclusion of the opening part of Mr. Levine's closing argument. Do you—I will state that that was done after the comment. Of course, the comments are always made before you can object, but it was made at the closing of his argument and not at the time of the comments.

Do you have any motions or things to say in that regard?

Defense Counsel: Yes, your Honor. I would like to place on the record my objection that at the conclusion of the first half of Mr. Levine's closing argument, I approached the Court and informed the Court that I objected to Mr. Levine's argument concerning urging the jury to award damages based upon his comparison of what a Kentucky Derby winning horse and the horse's leg would be worth.

---

**6.** The appellant also contends that certain arguments made by the appellee's counsel during closing argument were prejudicial. The appellant's counsel did not make a contemporaneous objection to any of these arguments, nor did the appellant ask for a curative instruction before the jury retired for its deliberations. Instead, after the jury began deliberating, the appellant made a motion for a mistrial which was denied by the circuit court. We have repeatedly held that a party's failure to make a timely objection to improper closing argument, and to seek a cura-

tive instruction, waives the party's right to raise the question on appeal. *See* Syllabus Point 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945); Syllabus Point 6, *McCullough v. Clark*, 88 W.Va. 22, 106 S.E. 61 (1921). We decline to address the contentions raised by the appellant.

The appellant also contends that the verdict was excessive. In light of the evidence in the record regarding the extensive nature of the appellee's injuries, we also decline to address this argument.

Judge: Speak up a little.

Defense Counsel: I'm trying not to talk so loud that the jury may hear.

Using the analogy of a Kentucky Derby winning horse, that if it had a damaged leg would be worth millions, and urging the jury to award to the plaintiff in this case likewise. We believe that is reversible error and I want to preserve my objection for it.

The manner in which defense counsel objected in this case was consistent with Rule 23.04(b) of the West Virginia Trial Court Rules, which states in part that "[c]ounsel shall not be interrupted in argument by opposing counsel, except as may be necessary to bring to the court's attention objection to any statement to the jury made by opposing counsel and to obtain a ruling on such objection." Rule 23.04(b) relaxes the general requirement of contemporaneous objection for closing argument purposes. *See Lacy v. CSX Transp. Inc.*, 205 W.Va. 630, 639, 520 S.E.2d 418, 427 (1999) ("Rule 23.04 ... disfavors objections by counsel during closing arguments."). Therefore, this issue was properly preserved for appellate review and should have been addressed by the majority opinion.

**2. *The racehorse argument constituted reversible error.*** Our cases have indicated "that this Court reviews rulings by a trial court concerning the appropriateness of argument by counsel before the jury for an abuse of discretion." *Lacy*, 205 W.Va. at 639, 520 S.E.2d at 427. Moreover, " '[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom.' " Syl. pt. 9, *State v. Flint*, 171 W.Va. 676, 301 S.E.2d 765 (1983) (quoting Syl. pt. 3, *State v. Boggs*, 103 W.Va. 641, 138 S.E. 321 (1927)).

In this case, the Hospital has argued that the trial judged abused its discretion in denying a new trial because of the improper closing remarks by plaintiff's counsel. The issue presented by the Hospital was addressed by the Court in *Roberts v. Stevens*

*Clinic Hosp., Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986). *Roberts* was a wrongful death case in which a jury returned a verdict for the plaintiff in the amount of $10,000,000. The defendant appealed. One of the issues raised was that the plaintiff improperly suggested a verdict amount to the jury. Specifically, "[c]ounsel argued that if a $10,000,000 racehorse had been killed through the negligence of a veterinary hospital, the measure of damages would be exactly $10,000,000." *Roberts*, 176 W.Va. at 499, 345 S.E.2d at 799. We recognized in *Roberts* that suggesting a verdict amount to the jury through a racehorse analogy was prejudicial and therefore reversible error. Unfortunately, the defendant in *Roberts* did not object to the statement during closing arguments. Consequently, the Court declined to reverse the jury verdict and award a new trial. However, because the Court found the error to be so egregious, relief was granted by reducing the jury's award from $10,000,000 to $3,000,000.

In this case, plaintiff's counsel used an analogy to suggest a verdict amount to the jury that was expressly disapproved in *Roberts*. Here, the majority opinion has taken great liberty to protect the verdict by refusing to squarely address the issue on its merits. I cannot accept the majority's position of simply ignoring the issue. The issue was properly preserved. Under *Roberts*, the Hospital was entitled to a new trial. Moreover, in syllabus point 7 of *Bennett v. 3 C Coal Co.*, 180 W.Va. 665, 379 S.E.2d 388 (1989), we held, in part, that suggesting a verdict amount to a jury for noneconomic damages will "result in reversible error where the verdict is obviously influenced by such statement." The million dollar racehorse argument, without question, influenced the jury to return a verdict for the plaintiff in the amount of $880,186.00.

Therefore, I concur, in part, and dissent, in part to the majority opinion. I am authorized to state that Justice MAYNARD joins me in this concurring and dissenting opinion.

McGRAW, C.J., concurring.

(Filed Dec. 18, 2001)

I concur with the majority opinion's conclusion that the circuit court did not err in

refusing to give a comparative negligence instruction to the jury. Also, having examined the record in its totality, I believe that appellant St. Mary's Hospital was not entitled to a new trial on the basis of a single comment by appellee's counsel during closing argument.

During appellee's initial closing argument, counsel indicated that "if Brian Rowe was a horse, I could come in here and say, Well, that horse's leg's worth—a Kentucky Derby winner, millions and millions of dollars. You wouldn't have any problem. This young man is certainly worth as much as a horse."

Appellant did not contemporaneously object to this statement. My dissenting colleagues suggest that the appellant's counsel did not need to contemporaneously object, concluding that of the West Virginia Trial Court Rule 23.04(b) "disfavors objections by counsel during closing arguments." *Lacy v. CSX Transp. Inc.*, 205 W.Va. 630, 639, 520 S.E.2d 418, 427 (1999). I must point out at the outset that in *Lacy* the challenging party had previously objected by way of a motion *in limine*, and the Court merely indicated that in such context a contemporaneous objection was unnecessary and, as a result, disfavored under Rule 23.04(b). The Court in *Lacy* by no means suggested or implied that the longstanding requirement of a contemporaneous objection was abrogated by adoption of Rule 23.04(b).

Appellant argues that it could not fairly object to appellee's argument without drawing it undue attention. The problem with this position is that the record shows that appellant's counsel was ready, willing, and able to contemporaneously object to other comments made by appellee's counsel. The record reflects that, subsequent to appellee's racehorse analogy, the following occurred in front of the jury:

Mr. Levine: Ladies and Gentlemen of the Jury, this case cries out for justice. It cries out for justice for two reasons. One, because he deserves it. And the other because we, as a society, need for you to tell hospitals you can't neglect us. You can't put commercials on TV and say "We are a healing place."

Mr. Farrell: Objection, your Honor.

In this instance, appellant's counsel properly interrupted "argument by opposing counsel ... [as was] necessary to bring to the court's attention objection to any statement to the jury made by opposing counsel and to obtain a ruling on such objection." W. Va. Trial Ct. R. 23.04(b).

Furthermore, while the record suggests that appellant's counsel made some objection to the racehorse analogy to the circuit court before beginning his own closing argument, we do not know the substance of this argument. More importantly, *we do not know what relief—if any—that appellant sought.*

My dissenting colleagues suggest that "defense counsel approached the bench and motioned for a mistrial." I do not believe the record supports this interpretation of the record. Instead, I believe the record shows that appellant's counsel waited until after the jury was deliberating before seeking relief—and then, instead of attempting to cure the error, sought the ultimate sanction of a mistrial. The record, and the dissenting opinion, shows the following discussion occurred after the jury retired to begin its deliberations:

The Court: ... Mr. Farrell, you made an objection at the conclusion of the opening part of Mr. Levine's closing argument. Do you—I will state that that was done after the comment. Of course, the comments are always made before you can object, but it was made at the closing of his argument and not at the time of the comments.

Do you have any motions or things to say in that regard?

Mr. Farrell: Yes, your Honor. I would like to place on the record my objection that at the conclusion of the first half of Mr. Levine's closing argument, I approached the Court and informed the Court that I objected to Mr. Levine's argument concerning urging the jury to award damages based upon his comparison of what a Kentucky Derby winning horse and the horse's leg would be worth....

Using the analogy of a Kentucky Derby winning horse, that if it had a damaged leg would be worth millions, and urging the jury to award to the plaintiff in this case likewise. We believe that is reversible

error and I want to preserve my objection for it.

The record then shows the following discussion occurred:

> The Court: Mr. Levine, what do you have to say?
>
> Mr. Levine: I don't think—if it came out that way, I didn't mean it to. But I think that the cure would have been to object at the time it was made and to have a curative instruction. I think Mr. Farrell—and he did object during part of the argument. I don't think I said it that way. . . .
>
> The Court: Well, because of prior case law in this state with a Kentucky Derby winner or horse race is used, it is the prime example they used for improper argument . . . by use of a formula. I noted it . . . I don't know that it approached an improper comparison, but at least enough to raise an eyebrow and take the motion. I don't know how to cure it except to say disregard it, which brings attention to it.

It appears that, at this point, counsel for appellant first made a motion for relief—and instead of asking for a curative instruction, asked for a mistrial:

> Mr. Farrell: Your Honor, at this time we would move for a mistrial based upon improper argument.
>
> The Court: Do you want me to declare a mistrial?
>
> Mr. Farrell: Yes, your Honor.
>
> The Court: Motion denied. May be renewed. But it's denied.

Our case law makes it clear that a party's failure to make a timely objection to improper closing argument, and to seek a curative instruction, waives the party's right to raise the question on appeal. We stated in syllabus point six of *Yuncke v. Welker,* 128 W.Va. 299, 36 S.E.2d 410 (1945), that:

> Failure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court.

*Accord,* syl. pt. 2, *State v. Adkins,* 209 W.Va. 212, 544 S.E.2d 914 (2001) (per curiam); syl. pt. 3, *Finley v. Norfolk & Western Ry. Co.,* 208 W.Va. 276, 540 S.E.2d 144 (1999) (per curiam); syl. pt. 1, *State v. Garrett,* 195 W.Va. 630, 466 S.E.2d 481 (1995); syl. pt. 5, *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995). Similarly, we stated in syllabus point six of *McCullough v. Clark,* 88 W.Va. 22, 106 S.E. 61 (1921):

> This court will not consider errors predicated upon the abuse of counsel of the privilege of argument, unless it appears that the complaining party asked for and was refused an instruction to the jury to disregard the improper remarks, and duly excepted to such refusal.

*Accord, Finley v. Norfolk & Western Ry. Co.,* 208 W.Va. 276, 282, 540 S.E.2d 144, 150 (1999) (per curiam); syl. pt. 4, *Skibo v. Shamrock Co., Ltd.,* 202 W.Va. 361, 504 S.E.2d 188 (1998) (per curiam); syl. pt. 10, *Pasquale v. Ohio Power Co.,* 187 W.Va. 292, 418 S.E.2d 738 (1992). Our statement in *Lacy v. CSX Transportation, Inc., supra*—that objections during closing arguments are "disfavored" where the challenging party has already sought and obtained a ruling *in limine* on an anticipated line of argument—did nothing to alter these requirements.

Appellant could have made a timely objection to appellee's closing argument, as was apparent by appellant's lone objection to another comment made at trial. Appellant chose to wait until after appellee completed his initial closing, and then appears to have only made an objection. Appellant did not seek an instruction to the jury to disregard the remark—instead, the record may be read to suggest that appellant waited until after the jury retired to deliberate to ask the circuit court for a mistrial.

On this record, the majority properly refused to examine the effect this remark by appellee's counsel may have had upon the jury's deliberations.

My dissenting colleagues state that appellee's racehorse analogy "without question, influenced the jury to return a verdict for the plaintiff in the amount of $880,186.00." I believe that, without an understanding of appellee's injuries, this statement unfairly ignores the evidence of appellee's injuries. The record firmly supports appellee's verdict. Appellee was admitted to the emergency room of appellant St. Mary's Hospital, and

misdiagnosed with a sprain to his knee. For two and a half hours, nurses could not find a pulse in appellee's leg—yet he was released to go home. The next day, appellee was admitted to the emergency room of Cabell Huntington Hospital, and diagnosed as having a laceration to an artery in his knee. Within three hours, he was in surgery to repair the artery.

Appellee was hospitalized for 35 days, and left with massive scarring, nerve damage, a stiff ankle, a foot that he drags, a need for leg braces for the rest of his life. Because the leg braces force him to walk crooked, he is thrown off balance—and his back is now in constant pain. He can't walk properly, he can't sleep because of the pain and difficulty maintaining a comfortable posture, he can't run, he can't play sports. He can't even carry his young children up the stairs because he cannot maintain his balance.

I believe the jury in the instant case was properly entrusted to determine the value of appellee's leg. Even removing appellee's closing argument from the equation, the record amply supports the jury's verdict.

I therefore respectfully concur with the majority's opinion.